IVELISSE ARCHILLA y MAURICIO CUCALÓN, demandantes y recurrentes, *v.* SMYTH WORLDWIDE MOVERS, INC., h/n/c SMYTH CARIBBEAN VAN LINES, INC., SMYTH CARIBBEAN VAN LINES y TONY PÉREZ, demandados y terceros demandantes, *v.* AMERICAN RED BALL TRANSIT CO., INC., y/o RED BALL INTERNATIONAL, terceros demandados y recurridos, *v.* NOPAL CARIBE LINES, segunda tercera demandada.

*Número:* R-77-67      *Resuelto:* 29 de noviembre de 1977

*S. L. Lagarde Garcés, Amador Ramírez Silva, Yamil Galib Frangie, Amadeo Nazario Janer, José A. Andreu García* y *Eudaldo Báez Galib,* abogados de los recurrentes; *Jiménez & Fusté* y *Paul E. Calvesbert Borgos,* abogados de los terceros demandados y recurridos; *Bauzá & Dávila* y *Luis Sánchez Betances,* abogados de los demandados y terceros demandantes; *Francisco A. Galeano,* abogado de Mauricio Cucalón, uno de los recurrentes.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

Los esposos Cucalón entregaron a Smyth Worldwide Movers, Inc. ("Smyth") los muebles y enseres de su residencia en Puerto Rico para transporte y entrega al nuevo hogar que iban a establecer en Cali, Colombia. El señor Cucalón es de nacionalidad colombiana. El matrimonio pagó a Smyth por tal concepto los portes y cargos correspondientes. Smyth subcontrató con American Red Ball Transit Co., Inc. ("Red Ball") la ejecución de lo pactado por ella. Red Ball le encargó a su vez a Nopal Caribe Lines ("Nopal") la transportación marítima de los bienes, la cual efectuó en un buque de matrícula noruega. Una cuarta corporación, Aviomar, Ltda. ("Aviomar"), de Colombia, tenía la responsabilidad de rendir allá otros servicios. Aunque de los autos no se desprende con entera claridad la naturaleza de los mismos, inferimos que la obligación de Aviomar consistía en el transporte terrestre de los bienes, su desembalaje y entrega final.

La carga arribó a Cartagena en buenas condiciones. A pesar de las gestiones realizadas por los esposos Cucalón a través de Aviomar, la mercancía permaneció en el muelle varias semanas. Al entregarse finalmente en Cali, se halló que la mayor parte de la carga se había perdido y el resto se había averiado en gran medida. Los esposos Cucalón instaron demanda contra Smyth, reclamando como parte de los daños una partida por las angustias sufridas. Smyth demandó como tercero a Red Ball y Red Ball a su vez interpuso otra demanda de tercero contra Nopal. Los esposos Cucalón no enmendaron su demanda para incluir como codemandados a Red Ball y a Nopal.

Red Ball solicitó que se dictase sentencia parcial por las alegaciones a fin de eliminar la solicitud de daños mentales. El tribunal concedió el remedio requerido. Los esposos Cucalón plantean en alzada tres cuestiones. Sostienen que Red Ball no posee capacidad, en su calidad de tercera demandada, para esgrimir contra la parte demandante defensas supuestamente alegables tan solo por Smyth, demandada y deman-

dante contra tercero. Argumentan en segundo término que la *Carriage of Goods by Sea Act* ("Cogsa"), 49 Stat. 1207 (1936), 46 U.S.C.A. sec. 1300 *et seq.*, legislación invocada para apoyar la sentencia parcial, no es de aplicación a este caso. Por último, señalan que bajo el contrato existente procede la partida de daños eliminada. Será necesario discutir tan solo parte de estos planteamientos. Por razones relacionadas principalmente con un problema que yace oculto en el fondo de este caso, estimamos que el mismo debe devolverse al tribunal de instancia para trámite ulterior.

1. *Defensas oponibles por un tercero demandado contra el demandante.*

■ El planteamiento de los recurrentes sobre este particular es inmeritorio. La Regla 12.1 de Procedimiento Civil dispone en parte:

". . . El tercero demandado podrá oponer contra el demandante cualesquiera defensas que el demandante contra tercero tuviere contra la reclamación del demandante. El tercero demandado podrá también deducir contra el demandante cualquier reclamación que surja de la transacción o evento que motive la reclamación original en el pleito . . . ."

Red Ball tenía derecho a utilizar contra los demandantes cualquier defensa oponible por Smyth contra los esposos Cucalón, sujeto a salvaguardas mencionadas más adelante.

Los demandantes recurrentes fundan su argumento en el caso de *M.V.M.* v. *St. Paul Fire and Marine Insurance Co.*, 20 F.R.D. 296 (D.C. N.Y. 1957), revocado por otras razones en 258 F.2d 374 (2d Cir. 1958). La teoría de *St. Paul Fire* es al efecto de que un tercero demandado únicamente puede oponer defensas contra el demandante cuando éste traba controversia formal contra aquél mediante enmienda a su demanda. *St. Paul Fire* ha sido objeto de dura crítica. Feldman, *A Puzzle Under the Federal Impleader Rule*, 34 Tul. L. Rev. 77, 85–86 (1959). Al igual que muchos otros tribunales, rehusamos adoptar, por artificial y mecánica, la regla de

*St. Paul Fire.* Véanse, por ejemplo, *Carey* v. *Schuldt*, 42 F.R.D. 390 (E.D. La. 1967) ; *Knell* v. *Feltman*, 174 F.2d 662 (App. D.C. 1949) ; *Falls Industries, Inc.* v. *Consolidated Chemical Industries, Inc.*, 258 F.2d 277 (5th Cir. 1958) ; *Wiggins* v. *City of Philadelphia*, 216 F.Supp. 241 (E.D. Pa. 1963) ; *F. & D. Property Co.* v. *Alkire*, 385 F.2d 97 (10th Cir. 1967).

■ La razón del fragmento citado de nuestra Regla 12.1 de Procedimiento Civil es proteger al tercero demandado de la negligencia del demandado en la tramitación del pleito, así como de una posible colusión entre el demandado y el demandante en perjuicio del tercero. 6 Wright & Miller, *Federal Practice and Procedure*, sec. 14.57; Wright, *Law of Federal Courts*, 2ª ed. 1970, pág. 336; 3 Moore, *Federal Practice*, sec. 14.01[3]. Mal servido queda este propósito con la imposición de trabas formalistas al levantamiento de defensas por el tercero demandado. *Cf. Vda. de Rivera* v. *Pueblo Supermarkets*, 102 D.P.R. 134 (1974) ; *Viñas* v. *Pueblo Supermarket*, 86 D.P.R. 33 (1962).(¹)

## 2. *La inaplicabilidad de Cogsa.*

■ Cogsa no gobierna este litigio. Los términos de la ley revelan con toda claridad que la misma tan solo se aplica desde que se embarcan los bienes en el navío hasta su descargo. El Art. 1(e) de la ley, 46 U.S.C.A. sec. 1301(e), dispone en su texto original:

"(e) The term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship."

Véanse: 1 Benedict, *On Admiralty*, 1974, sec. 224, pág. 14–13; Gilmore & Black, *The Law on Admiralty*, Brooklyn, 1957, pág. 126.

---

(¹) La norma enunciada tiene sus límites. Cuando el tercero demandado intenta utilizarla para revivir defensas que el demandado no planteó a tiempo, la situación exige riguroso escrutinio. Véase: 6 Wright & Miller, *op. cit.*, pág. 307.

Es cierto que el Art. 7 de Cogsa, 46 U.S.C.A. sec. 1307, permite estipulaciones en el conocimiento de embarque encaminadas a extender la responsabilidad del porteador al período anterior a la carga y posterior a la descarga. El conocimiento de embarque entre Red Ball y Nopal extiende Cogsa a tales períodos. De los autos no se desprende que exista una cláusula comparable en los contratos entre Red Ball y Smyth y entre Smyth y los esposos Cucalón. Cogsa es en consecuencia relevante tan solo para determinar la responsabilidad de Nopal, cuestión no envuelta en el actual recurso. No se desprende de las alegaciones que los esposos Cucalón consintieron o que se enteraron de la referida ampliación contractual de Cogsa. ([2])

3. *Efectos de la inaplicabilidad de Cogsa.*

Para el debido enfoque de esta cuestión conviene examinar brevemente el patrón estatutario del que Cogsa es tan solo una parte, así como las circunstancias que lo produjeron. El siglo diecinueve presenció la pugna en diversos países entre los intereses de las navieras y los de los comerciantes que dependían en gran escala del transporte marítimo. En Estados Unidos regía inicialmente la norma de la responsabilidad sin culpa, excepto cuando el daño a la mercancía era el fruto de fuerza mayor o de la negligencia del consignador. *Propeller Niagara* v. *Cordes*, 62 U.S. (21 How.) 7, 23 (1859). En Inglaterra, del otro lado, se fue acrecentando de tal modo el número de excepciones beneficiosas a los intereses navieros que llegó a permitirse que éstos insertasen cláusulas que los exoneraban aun de su propia negligencia. Gilmore & Black, *op. cit.*, 122. Con ánimo de lograr un acomodo de los intereses en pugna, Estados Unidos aprobó la Ley Harter, 27 Stat. 445 (1893), 46 U.S.C.A. secs. 190–196. Esta le pro-

---

([2]) El caso de *Santiago* v. *Sea Land Service*, 366 F.Supp. 1309 (D.C. P.R. 1973), en que se apoya la sentencia dictada, se refiere a una situación de hechos regida por Cogsa.

hibió a todo dueño o agente de buques dedicados al transporte de bienes entre puertos de Estados Unidos o entre éstos y puertos extranjeros la inserción en conocimientos u otros documentos de embarque de cláusula alguna encaminada a relevarlo de responsabilidad por daños derivables de su propia culpa al cargar, custodiar o entregar la mercancía. 46 U.S.C.A. sec. 190. Del otro lado, se limitó la responsabilidad del naviero en maneras que no afectan la controversia actual. Gilmore & Black, *op. cit.*, págs. 119–127.

De ahí en adelante se luchó por impartirle categoría de norma internacional a la transacción representada por la Ley Harter. Estos esfuerzos produjeron las llamadas Reglas de La Haya de setiembre de 1921. Chorley y Giles, *Derecho Marítimo*, trad. de la 4ª edición inglesa, con notas de Sánchez Calero sobre el derecho español, Barcelona, 1962, pág. 143. Las Reglas de la Haya, que no tenían rango de tratado, lo adquirieron finalmente en la Convención de Bruselas de 25 de agosto de 1924. Bevans, 2 *Treaties and other International Agreements of the United States of America, 1776–1949*, págs. 430–442. La Convención de Bruselas se basa en gran medida en la Ley Harter pero, entre otras diferencias de importancia, no se extendió a los eventos que ocurriesen con anterioridad al momento del embarque de los bienes ni con posterioridad al momento de su descarga. Cogsa es simplemente, con leves variantes, una copia de la Convención.

Cuando expresamos que el pleito presente no es enteramente resolvible por Cogsa estamos por tanto diciendo que la Convención de Bruselas, ratificada por el Senado de Estados Unidos en 1937, también es inaplicable a esta disputa. Debe consignarse, además, que no existe constancia de que la República de Colombia se haya adherido a la referida Convención.

El resultado es que hay que determinar, dada la ausencia de normas uniformes entre las posibles jurisdicciones, cuál es el derecho verdaderamente aplicable a esta disputa. En

tales circunstancias es ineludible adentrarnos en la discusión del problema de Derecho Internacional Privado que este litigio encierra.

## 4. *La cuestión de Derecho Internacional Privado.*

Según señala Knauth, discutiendo el asunto específico del conflicto de leyes en el campo de la transportación marítima, [3] a veces se ha argumentado que los tribunales deben aplicar tan solo la ley de su propio país, lo que en efecto equivale a seleccionar el principio de la *lex fori* o ley del foro como la regla conflictual aplicable. Knauth condena esta estrecha posición por perjudicial al comercio y a los mejores intereses de la justicia. Knauth, A. W., *Renvoi and Other Conflicts Problems in Transportation Law,* 49 Colum. L. Rev. 1, 2 (1949). Véase también: 1 Beale, *Conflict of Laws,* sec. 8.1 (1935). Inglaterra y Estados Unidos han demostrado cierta renuencia histórica a aplicar otras normas que no sean las propias. Esta tendencia, aislacionista y destructora de la esencia misma del Derecho Internacional Privado, hace tiempo que viene batiéndose en retirada. Nussbaum, Arthur, *Principles of Private International Law,* Oxford Univ. Press, 1943, págs. 15, 26–27, 34–36. Por tratados multilaterales como la Convención de Bruselas y en ciertas instancias por acuerdo bilateral se han eliminado o reducido los conflictos de leyes entre diversos países. Subsisten, no obstante, serios problemas de Derecho Internacional Privado en el campo del derecho marítimo cuando no existen reglas uniformes entre los países envueltos. Sinclair, A. M., *Conflict of Law Problems in Admiralty,* 15 Sw. L.J. 1, 7–10, 207–210, 242–243 (1961).

No podemos disponer de este pleito, por tanto, sin referencia al problema de Derecho Internacional Privado. Es

---

[3] Las referencias en esta opinión a los diversos tipos de contrato de transporte marítimo no significan que estamos excluyendo la posibilidad de que la prueba en su día establezca la existencia de un contrato mixto o de otra naturaleza.

improcedente la aplicación automática a esta controversia de la Ley Harter, (⁴) o de esa entidad mística y misteriosa, combatida por Holmes, (⁵) llamada el derecho federal de almirantazgo, (⁶) o de cualquier otro cuerpo de derecho puramente local. (⁷) Es enteramente posible que el examen de la cuestión conflictual exija la aplicación de nuestro derecho en este caso, pero primero tenemos que resolver cuál es la regla de Derecho Internacional Privado que debe regir esta controversia. Esto se reconoce ya fundamentalmente en la propia Ingla-

---

(⁴) Aunque la Ley Harter se aprobó en 1893, ésta se incorporó a nuestro régimen jurídico en virtud de lo dispuesto en el Art. 14 de la Ley Orgánica de 1900, 31 Stat. 80, y el Art. 9 de la Ley Jones de 1917, 39 Stat. 954, hoy parte de la Ley de Relaciones Federales, 64 Stat. 319. Igual ocurre con Cogsa, hasta donde alcanzan sus disposiciones. Tal es la fuente de su aplicación en Puerto Rico.

(⁵) Véase la opinión disidente de Holmes en *Southern Pacific Co.* v. *Jensen*, 244 U.S. 205, 218, 220 (1916).

(⁶) No es necesario terciar en este pleito en la controversia sobre el ámbito respectivo de los poderes federales y estatales sobre cuestiones de almirantazgo. Para una discusión extensa de la materia véase: Robertson, D. W., *Admiralty and Federalism,* The Foundation Press, N.Y. 1970. Robertson concluye que buena parte del derecho aplicable a asuntos marítimos puede dejarse al cuido de los estados sin causar daño al interés en la uniformidad. *Ibid.,* 283. La situación de Puerto Rico provoca problemas de especial interés. En *Lastra* v. *N.Y. & P.R. S.S. Co.,* 2 F.2d 812 (1st Cir. 1924), se resolvió que la cláusula sobre almirantazgo de la Constitución de Estados Unidos no se aplica *ex proprio vigore* a Puerto Rico, debiendo extenderse tan solo a los estatutos que el Congreso legítimamente apruebe al amparo de la misma. *Lastra* ha sufrido erosión en la jurisprudencia federal posterior, aunque debe recordarse que es hasta ahora la norma de *Lastra* la que rige en este foro. *United Porto Rican Sugar Co.* v. *Corte,* 44 D.P.R. 930 (1933). Para la consideración de las interrogantes que se plantean en el caso puertorriqueño, véanse: Casellas, Salvador, *Federal and Commonwealth Jurisdiction in the Field of Maritime Law,* 26 Rev. C. Abo. P.R. 259 (1966); Ydrach, Vicente, *Court Decisions Regarding Maritime Law in Puerto Rico,* 26 Rev. C. Abo. P.R. ·121 (1966); Arroyo, Elí, *The Conflict Between the Federal Relations Act and the General Law of Admiralty,* 26 Rev. C. Abo. P.R. 189 (1966).

(⁷) En este sentido es preciso mencionar la controversia existente sobre la vigencia o no del Libro Tercero del Código de Comercio en Puerto Rico. Véanse: Casellas, *op. cit.,* escolio 6 de esta opinión y Headrick, W. C., *El Sistema Normativo Vigente en las Aguas Territoriales de los Estados Unidos y de Puerto Rico,* 38 Rev. Jur. U.P.R. 329 (1969).

terra y en Estados Unidos. La jurisprudencia inglesa moderna ha abandonado la referencia a un derecho general marítimo en lo que concierne al transporte de bienes y en Estados Unidos tal alusión se ha ido convirtiendo en otro modo de invocar el principio de la *lex fori*. 3 Rabel, *The Conflict of Laws—A Comparative Study*, Chicago, 1950, pág. 257.

Se han desarrollado en el derecho marítimo y específicamente en la modalidad del contrato de fletamento como transporte de mercancía, diversos criterios para precisar la norma conflictual aplicable en circunstancias contentivas de elementos foráneos. La ley del pabellón de la nave se favorece en ausencia de estipulación en contrario, en Italia y en otros países. Vitta, *Diritto Internazionale Privato*, vol. III, Torino, 1975, pág. 366. Alemania, Holanda, Bélgica y Grecia han adoptado la *lex loci solutionis* o ley del país al que se consignan los bienes. 3 Rabel, *op. cit.* 264. Inglaterra y Francia apoyan la *lex loci contractus* o ley de la conclusión del contrato. Miaja de la Muela, *Derecho Internacional Privado*, tomo II, Madrid, 1976, pág. 395. La doctrina española se inclina en ciertas circunstancias a la ley de la conclusión del contrato y en otras a la de la ejecución. Miaja de la Muela, *loc. cit.* Se han elaborado muchos otros criterios de selección que sería prolijo enumerar aquí. (8)

En Estados Unidos la doctrina ha sufrido oscilaciones notables. El primer *Restatement*, en cuya formulación Beale jugó un papel de extrema importancia, adoptó la *lex loci solutionis. Restatement, Conflict of Laws*, secs. 358 (d) (e), 370, 372. La selección fue objeto de severa crítica. Nussbaum, *Principles of Private International Law*, Oxford Univ. Press, 1943, pág. 174 *et seq.* Von Mehren y Trautman señalaron que los contratos de transporte de bienes presentan problemas

---

(8) Consúltense: Sinclair, *Conflict of Law Problems in Admiralty*, 15 Sw. L.J. 1, 207 (1961); 3 Rabel, *The Conflict of Laws, A Comparative Study*, Chicago, 1950, págs. 243–290; Kahn-Freund, *The Proper Law of a Contract and Affreightment*, 17 Modern L. Rev. 255 (1954).

especiales que provocan la inaplicabilidad aun de la propia teoría de los contactos más relevantes, ya que ordinariamente precisa escoger entre dos contactos de peso generalmente igual: el lugar del embarque y el del destino de la carga. Von Mehren y Trautman, *The Law of Multistate Problems*, Little, Brown & Co., Boston, 1965, pág. 191. Currie abogó por un enfoque más realista que tomase francamente en consideración los múltiples factores que pueden influir el fallo en este tipo de pleitos. Currie, *Selected Essays on the Conflict of Laws*, Duke Univ. Press, 1963, págs. 361-375. En el segundo *Restatement* se atendió parte de estas críticas. *Restatement Second, Conflict of Laws*, 1971, sec. 197.

El segundo *Restatement* rechazó el criterio del anterior. En vez de la ley del país donde se entrega la carga adoptó como regla general la ley del lugar de embarque, pero intentó impartirle cierta flexibilidad a la norma enunciada mediante el principio de que ésta no debe aplicarse si algún otro estado tiene una relación más relevante con el evento, conforme las reglas que se expresan en otra sección de la obra. ([9])

---

[9] En su versión original, el Art. 197 citado dispone:

"§ 197. Contracts of Transportation

"The validity of a contract for the transportation of passengers or goods and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state from which the passenger departs or the goods are dispatched, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the contract and to the parties, in which event the local law of the other state will be applied."

La Sec. 6 a que se refiere el texto transcrito provee:

"§ 6. Choice-of-Law Principles

"(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

"(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

"(a) the needs of the interstate and international systems,

"(b) the relevant policies of the forum,

"(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

"(d) the protection of justified expectations,

"(e) the basic policies underlying the particular field of law,

El segundo *Restatement* ha sido también objeto de crítica adversa, especialmente durante el proceso de su formulación. Leflar, *Conflicts Law: More on Choice-Influencing Considerations*, 54 Calif. L. Rev. 1584 (1966) ; Reese, *Conflict of Laws and the Restatement Second*, 28 Law & Contemp. Prob. 679 (1963) ; Ehrenzweig, *The Second Conflicts Restatement: A Last Appeal for its Withdrawal*, 113 U. Pa. L. Rev. 1230 (1965). El problema básico en el segundo *Restatement* es que, aunque se le impartió mayor flexibilidad que al primero, todavía retiene cierta rigidez esencial, sustituyendo simplemente el puerto del destino de la carga por el de su embarque para fines de seleccionar, en términos generales, la ley aplicable y suavizando esta presunción con la teoría conocida como la del centro de gravedad o de los contactos predominantes.

Leflar, Currie, Cheatham, Reese, Cavers, Yntema y Ehrenzweig, entre otros distinguidos estudiosos de la materia, estiman que el enfoque correcto consiste en concentrar en las verdaderas razones que en la realidad determinan o deben determinar la decisión de cada situación conflictual específica. Leflar, *op. cit.*, 1585. Las reglas mecánicas lo único que producen es un falso sentido de seguridad, obtenido a menudo a costa de la justicia y de la consideración debida en el tráfico entre los pueblos. De lograrse acuerdos internacionales multilaterales entre diversas naciones, su uso es más explicable, pero cuando tal no es el caso lo que se promueve es la búsqueda desesperada del foro más acogedor, hecho que ha llevado al desprestigio en esta disciplina, como hemos indicado, del empleo a contramarcha de la *lex fori* en todo caso.

■ No existe tratado estadounidense alguno que gobierne el problema que nos ocupa. Colombia firmó en 1933 un tratado sobre Derecho Mercantil Internacional para regir, entre otras materias, los contratos de fletamentos que envol-

---

"(f) certainty, predictability and uniformity of result, and
"(g) ease in the determination and application of the law to be applied."

viesen relaciones entre ella y otras naciones. Estados Unidos no consintió al mismo. Eder, *American-Colombian Private International Law*, N.Y. 1956, pág. 86 *et seq.* La Ley Harter no expresa normas de Derecho Internacional Privado que regulen el caso presente. Tampoco lo hacen nuestros códigos Civil y Mercantil. Es nuestro deber, en consecuencia, formular la norma conflictual aplicable en este género de casos.

Consideramos que en vez de enunciar una regla general a modo de presunción, sujeta a excepciones, lo correcto es que se proceda a ponderar en cada caso en particular la relativa importancia de los intereses envueltos. Tal tarea exige la evaluación de los siguientes factores. Se advertirá que en la confección de esta lista seguimos fundamentalmente, con ciertas adiciones y omisiones, la enumeración del segundo *Restatement* en su versión final, la cual intenta recoger en parte las críticas vertidas en el proceso de su redacción. Deben considerarse: las necesidades de la comunidad internacional y, en casos de conflictos interestatales estadounidenses, las del federalismo en que se fundan; las políticas del foro y el interés y la razonabilidad de aplicarlas; las políticas de otras naciones y estados, el interés en su aplicación al caso concernido y la base, si alguna, de un posible acomodo; el modo de proteger las expectativas de las partes; los principios y tendencias percibibles en este campo del derecho; el grado de certeza, predictibilidad y uniformidad de resultados asequibles en el caso bajo examen, sin sacrificio del valor acreditable a otros factores; y, especialmente importante, la selección de la ley más justa.

A la luz de la norma conflictual anterior resulta claro que debe devolverse el caso al Tribunal Superior. El problema de Derecho Internacional Privado que hemos estado analizando no fue objeto de discusión ante dicho foro ni ante nos. No se sometió prueba sobre el derecho colombiano ni sobre otros factores mencionados que pusiesen en condiciones al Tribunal Superior y a este Tribunal de resolver la controversia en su

fondo. Aun de adoptarse tan solo la norma del segundo *Restatement*, la ausencia de datos indispensables es evidente. Cuestiones de la envergadura que plantea este caso no son dilucidables con la magra información que nos brinda una moción de sentencia por las alegaciones.

*Se devuelve el caso al tribunal de instancia para procedimientos consistentes con esta opinión.*

El Juez Asociado Señor Martín concurre en opinión separada. El Juez Asociado Señor Negrón García concurre en el resultado. Los Jueces Asociados Señores Rigau y Torres Rigual no intervinieron.

—O—

Voto concurrente del Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 29 de noviembre de 1977

Concurro con el dictamen del Tribunal que ordena la devolución del caso de epígrafe al tribunal de instancia por entender que sin haberse aclarado la naturaleza de los varios contratos de transporte existentes entre las partes y los derechos y obligaciones que de ellos surgen a la luz de las normas jurídicas de derecho internacional privado o de derecho puertorriqueño que sean aplicables, el tribunal de instancia no tuvo base para desestimar la alegación de tales daños contenida en los párrafos 6(B), (C) y 7 de la demanda. La declaración del tribunal de instancia en el sentido de que no procede dicha partida de daños bajo un contrato de transporte marítimo parece encontrar apoyo en *Santiago* v. *Sea-Land Service, Inc.*, 366 F.Supp. 1309 (1963, Cancio J.), que fue resuelto bajo la ley federal *Carriage of Goods by Sea Act*, 46 U.S.C.A. sec. 1300 *et seq*. La conclusión a que llega el tribunal de instancia es insostenible mientras no se aporte evidencia de que la referida ley federal es la que regula los contratos de transporte entre las partes de este caso

en vez de las normas del derecho internacional privado o del derecho puertorriqueño.

Aunque mi inclinación hubiera sido desestimar el recurso instado por los demandantes por razón de que no tenemos la prueba documental necesaria para resolver sus planteamientos sobre la procedencia de los daños e inconveniencias morales y angustias mentales, el bien de la justicia exige en las circunstancias de este caso que el tribunal de instancia tenga ante sí la prueba necesaria en que apoyar sus conclusiones de derecho.