PEDRO JUAN SOTO ET AL., demandantes y recurrentes, *v.* CARIBE SHIPPING CO., INC., demandada y recurrida.

*Número:* RE-87-433          *Resuelto:* 26 de abril de 1991

388

*Marcos Rodríguez Frese,* abogado de los recurrentes; *Efraín Guzmán Mollet,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

## I

Los esposos Soto-Lugo contrataron los servicios de la empresa Fernando Roqué, Transportes Internacionales, S.A. (Fer-

nando Roqué) para transportar desde Zaragoza, España, a San Juan un baúl que contenía efectos personales. Entre estos efectos personales se encontraban los apuntes, planes, notas y borradores de tres (3) libros que serían escritos por el Sr. Pedro Juan Soto, quien es escritor. Además, en dicho baúl se encontraban sus apuntes conducentes a la obtención del grado de Doctor en literatura francesa y comparada, los cuales eran el producto de dos (2) años de investigaciones académicas.

El 12 de junio de 1976 la empresa Fernando Roqué embarcó el baúl antes indicado en Barcelona, España, en el buque holandés Amersfoort, de la línea de porteadores marítimos Koninklijke Nederlandsche Stoomboot-Maatschappij (K.N.S.M.). El consignatario de dicha carga era el codemandante Pedro Juan Soto, con dirección en el Condominio Q, Quintana, 6013-A, Hato Rey, Puerto Rico, 00917.

El baúl arribó al puerto de San Juan el 26 de julio de 1976. La compañía estibadora del buque, que realizó el desembarco de la mercancía, fue la demandada recurrida Caribe Shipping Co., Inc.

La reglamentación vigente disponía que transcurridos los cinco (5) días desde el descargo de la mercancía sin que el consignatario la reclamara, ésta sería transportada y almacenada en un almacén público "a riesgo y expensas del consignatario". Véanse: Customs Regulations, 19 U.S.C. sec. 1490(a); Orden General Núm. MI12957; 19 C.F.R. sec. 127 et·seq. De permanecer en dicho almacén por un (1) año sin que el consignatario la reclamara, sería vendida en' pública subasta. 19 U.S.C. sec. 1491(a).

La mercancía fue desembarcada en el puerto y transcurrieron los cinco (5) días dispuestos por la legislación sin que el consignatario la reclamara. Por ello, el Servicio Federal de Aduanas envió el baúl a un almacén de adeudos localizado en Miramar. 19 U.S.C. sec. 1490.

El 19 de agosto de 1976, unos veinticuatro (24) días luego de que el baúl arribó a puerto, se desató un incendio en un negocio localizado en las inmediaciones de los almacenes de la aduana federal en Miramar. El incendio se extendió a otros negocios y

finalmente alcanzó los almacenes. El siniestro destruyó las estructuras de dichos almacenes así como la mercancía allí almacenada, incluso el baúl del señor Soto y su contenido.

Para fines de julio de 1976 el señor Soto había recibido una carta de Fernando Roqué (con fecha de 19 de julio de 1976) en la que le notifica que el baúl con sus efectos personales le había sido despachado de España con destino a Puerto Rico. Le incluyó el original y copias del conocimiento de embarque (*bill of lading*). Dicho documento especificaba el barco donde se embarcó el baúl (Amersfoot); el puerto de destino (San Juan, P.R.) y el consignatario (Pedro Juan Soto). *Exhibit* 11 del demandante.

La demandada, Caribe Shipping Co., Inc. *era el agente del barco encargado de desembarcar, estibar, despachar y entregar la carga.* Ésta tuvo conocimiento del arribo del Amersfoot al puerto de San Juan el 26 de julio de 1976 e hizo los arreglos para atracar el barco y para su descarga. Como agente del barco, generalmente avisaba a los consignatarios la llegada de la mercancía enviando por correo ordinario copia del conocimiento de embarque con un sello de "Aviso de Llegada".

Durante el juicio de autos, el encargado de enviar los avisos expresó que enviaba miles de avisos de llegada, pero que no tenía la obligación de hacerlo. En este caso en particular indicó que había notificado a Soto de la llegada del baúl enviándole una copia del conocimiento de embarque en la cual se le había estampado el sello de "Aviso de Llegada" de carga en donde se indicaba que ésta llegaría el 27 de julio de 1976 y que, de no ser levantada a tiempo, sería enviada a un almacén público aproximadamente el 3 de agosto de 1976. Señaló que la notificación se hizo por correo ordinario tres (3) días antes del arribo del barco.

Sin embargo, el foro de instancia *determinó que, como cuestión de hecho, el señor Soto nunca recibió el documento de notificación antes descrito.*

El señor Soto advino en conocimiento de que la demandada era el agente a cargo de descargar el buque al escribir a Fernando Roqué el 4 de noviembre de 1976, preocupado por la tardanza en el recibo del baúl. Cuando el señor Soto se comunicó con la

demandada fue que por primera vez se enteró del fuego y de la pérdida del baúl.

Los demandantes, al conocer lo ocurrido, realizaron las reclamaciones extrajudiciales correspondientes, tanto a Caribe Shipping Co., Inc. como a Fernando Roqué. Las mismas resultaron infructuosas.

·Ante tal situación interpusieron demanda en daños y perjuicios contra Caribe Shipping Co., Inc. el 20 de abril de 1977. En la misma alegaron que la demandada fue negligente al no notificarles la llegada del buque que transportaba el baúl al puerto de San Juan.

El 28 de marzo de 1985, luego de celebrada la vista sobre negligencia, el tribunal de instancia emitió una resolución en la cual determinó que Caribe Shipping Co., Inc. había incurrido en negligencia y era responsable por los daños ocasionados por la pérdida del baúl. En consecuencia, dejó pendiente el señalamiento para la vista de daños.

El 12 de noviembre de 1985 el foro de instancia celebró una vista donde las partes presentaron el informe de conferencia con antelación al juicio. En esa vista la demandada presentó una moción de sentencia sumaria donde alegaba falta de jurisdicción del tribunal al haber emitido su resolución en que determinó negligencia porque el campo del derecho marítimo está ocupado por la ley federal *Carriage of Goods by Sea Act* (C.O.G.S.A.), 46 U.S.C. sec. 1300 *et seq.* En la alternativa, alegó que no se había establecido una causa de acción bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141.

Los demandantes presentaron su oposición a dicha moción la cual fue replicada por la demandada. El 14 de julio de 1987 el foro de instancia, *sua sponte*, decidió reconsiderar la Resolución de 28 de marzo de 1985 y emitir sentencia, desestimando así la demanda.

De esa sentencia recurren los demandantes ante nos mediante recurso de revisión. Expedido el auto, los recurrentes sometieron el caso a base de su recurso inicial y la recurrida ha comparecido mediante su alegato.

Los recurrentes aducen dos (2) señalamientos de error. En el primero imputan al foro de instancia el haber cometido error al resolver que la recurrida no era responsable por la pérdida de su baúl. El segundo señalamiento de error se refiere a no haber ordenado a la recurrida el pago de honorarios de las deposiciones tomadas a los peritos de los recurrentes. Discutiremos los señalamientos de error en ese mismo orden.

II

Resolvemos, en primer lugar, si el foro de instancia tenía jurisdicción sobre la materia o si, por el contrario, la controversia es una que debe ser dilucidada en el foro federal. Al hacerlo, discutiremos las leyes federales de derecho marítimo y su aplicación a la controversia de autos. Veamos.

■ Luego de promulgada la Ley Jones surgió la oportunidad de expresión sobre el derecho marítimo operante en Puerto Rico. El primero de estos casos fue *Lastra v. New York & Porto Rico S.S. Co.*, 2 F.2d 812 (1er Cir. 1924), donde el Tribunal Federal de Apelaciones para el Distrito de Puerto Rico estableció que la disposición sobre almirantazgo de la Constitución de Estados Unidos no aplicaba a Puerto Rico a menos que el Congreso, por legislación específica, la hiciera aplicable. A esos efectos expresó:

> We think that if Congress had intended, by the Organic Act, to extend the admiralty provisions of the Federal Constitution to Puerto Rico, language, apt and explicitly expressive of that purpose, would have been used; and that the language of Sec. 41, granting in general terms the same jurisdiction to the District Court of the United States in Porto Rico as have the District Courts of the United States does not import an extension of the substantive rights and obligations of our admiralty law to Porto Rico. *Lastra v. New York & Porto Rico S.S. Co.*, supra, pág. 814.

Tal norma fue reiterada en *Alcoa Steamship Company v. Pérez Rodríguez*, 376 F.2d 35 (1er Cir.), *cert.* denegado, 389 U.S. 905 (1967), y en *Salas Mojica v. Puerto Rico Lighterage Co., Inc.*, 492 F.2d 904 (1er Cir. 1974).

En general, los casos federales antes citados trataban sobre la aplicación de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 1 *et seq.*, en casos marítimos. En estos casos el tribunal federal sostuvo la aplicación de esta ley local aun cuando existía una ley de compensación federal.

■ En *Rhode Island Ins. Co. v. Pope & Talbot Lines*, 78 D.P.R. 454, 459 (1955), las partes habían contratado servicios para transporte de mercancía por mar mediante un conocimiento de embarque. El mismo establecía que la Ley sobre Transporte Marítimo de Mercancía —*Carriage of Goods by Sea Act* (C.O.G.S.A.)— 46 U.S.C. sec. 1300 *et seq.*, era la ley a aplicarse en el contrato. Allí resolvimos que los derechos y obligaciones de las partes se regían por C.O.G.S.A. y analizamos la prueba de acuerdo con dicha ley.

■ En *Archilla v. Smyth Worldwide Movers*, 106 D.P.R. 538 (1977), se transportó mercancía por mar de Puerto Rico a Colombia. En ese caso expresamos que tanto C.O.G.S.A. como la Ley Harter, 46 U.S.C. secs. 190–196, son fuentes de derecho de aplicación en Puerto Rico.

■ Por otra parte, en *León v. Transconex, Inc.*, 119 D.P.R. 102, 108 (1987), resolvimos que los tribunales de Puerto Rico *tenían jurisdicción concurrente* con los tribunales federales en materia de almirantazgo bajo la cláusula *saving to suitors* de un contrato de embarque marítimo (*bill of lading*).

■ Allí expresamos que:

La cláusula *saving to suitors*, dirigida a conferir jurisdicción a los tribunales estatales y a los federales . . . aplica de igual forma en Puerto Rico. *León v. Transconex, Inc.*, supra, pág. 109.

■ Tratándose en el caso de autos de una acción relacionada con el contrato de transporte marítimo y de la reclamación de daños por la pérdida de mercancía así transportada, resulta meridianamente claro que el foro de instancia *tenía jurisdicción*

*concurrente* para entender en la controversia que aquí nos ocupa. Véase, además, H. Longley, *Common Carriage of Cargo*, Nueva York, Ed. Mathew Bender, 1967, Sec. 22.01.

## III

■ Determinada la jurisdicción concurrente del foro de instancia sobre la controversia, debemos determinar la legislación federal o local aplicable a la misma. Véase *León v. Transconex, Inc.*, supra, pág. 115 esc. 11. En particular, cobran relevancia dos (2) leyes federales íntimamente relacionadas entre sí pero con efectos distintos. Estas son la Ley Harter, *supra*, y la Ley sobre Transporte Marítimo de Mercancía (C.O.G.S.A.), *supra*, ambas extensivas a Puerto Rico en virtud del Art. 8 de la Ley de Relaciones federales con Puerto Rico, L.P.R.A., Tomo 1, Sec. 8. Véase *Archilla v. Smyth Worldwide Movers*, supra.

■ Examinemos brevemente el transfondo y el alcance de ambas leyes. En 1893 el Congreso de Estados Unidos aprobó la Ley Harter, tratando de lograr un balance de intereses entre los porteadores marítimos, los comerciantes y los dueños de mercancías que utilizaban los barcos para transportar las mismas. Se intentó con la ley prohibir la práctica de los porteadores marítimos de incluir en conocimientos u otros documentos de embarque cláusulas encaminadas a relevarlos de toda responsabilidad, aun de la derivada de su culpa o negligencia al cargar, custodiar o entregar la mercancía. Sin embargo, se le reconocía al porteador que cuando mediara un error de navegación luego de desplegar la debida diligencia, o cuando el daño ocurriese al tratar de salvar vida o propiedad en el mar, quedaba liberado de responsabilidad. Véanse: Gilmore and Black, *The Law of Admiralty*, 2da ed., Nueva York, Ed. Foundation Press, 1975, pág. 119 *et seq.*; D. Villarreal, *Carrier's Responsibility to Cargo and Cargo's to Carrier*, 45 Tul. L. Rev. 770, 773 (1971).

■ Para lograr este acomodo de intereses se incluyeron en dicha ley varias disposiciones encaminadas a uniformar los con-

tratos de embarque. *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422. F.2d 7 (2do Cir. 1969).

▮▮▮ Dicha ley se hizo aplicable tanto al comercio marítimo doméstico como al internacional. Véase M. Bayard Crutcher, *The Ocean Bill of Lading—A Study in Fossilization*, 45 Tul. L. Rev. 697, 711 (1971). La cubierta de la Ley Harter es amplia y regula los derechos y obligaciones de las partes desde que se *embarcan* los *bienes* hasta su *desembarco, almacenaje* y *entrega*. La Ley Harter cubre, pues, aquellos eventos posteriores al descargo de la mercancía. *Archilla v. Smyth Worldwide Movers*, supra, págs. 543–544; 46 U.S.C. sec. 190; *The Monte Iciar*, 167 F.2d 334 (3er Cir. 1948); *Levatino Co. v. M.S. Helvig Torm*, 1968 A.M.C. 2263 (S.D. N.Y. 1968); W. Tetley, *Marine Cargo Claims*, 3ra ed., Montreal, Les Editions Yvon Blais, Inc., 1988, págs. 771–772. Así, en *Allied Chemical v. Companhia de Navegacao*, 775 F.2d 476, 482 (2do Cir. 1985), el Tribunal Federal de Apelaciones para el Segundo Circuito expresó sobre dicha ley:

> Although the enactment of COGSA sharply curtailed the applicability of the Harter Act . . . to ocean bills of lading and matters of ocean carriers' liability, absent a valid agreement to the contrary, the Harter Act still governs prior to loading *and after discharge of cargo until proper delivery is made*. (Énfasis suplido.)

En *Caterpillar Overseas, S.A. v. S.S. Expeditor*, 318 F.2d 720, 723 (2do Cir. 1963), también se resolvió, en relación con la Ley Harter, que:

> COGSA's coverage, however, extends only to the period, in foreign commerce, "from the time when the goods are loaded to the time when they are discharged from the ship." . . . Harter remained applicable, therefore, to the period between the discharge of cargo from the vessel *and its proper delivery*. (Énfasis suplido.)

▮▮▮ En 1936 el Congreso aprobó la Ley sobre Transporte Marítimo de Mercancía (C.O.G.S.A.) siguiendo las normas adoptadas en la Convención de Bruselas de 1924.

C.O.G.S.A., por sus propios términos, sólo aplica al comercio marítimo con el extranjero (*foreign trade*). Sin embargo, la propia

ley permite que las partes acuerden taxativamente en el conocimiento de embarque acogerse a dicha ley aunque se trate de comercio marítimo local. *Rhode Island Ins. v. Pope & Talbot Lines*, supra; *Archilla v. Smyth Worldwide Movers*, supra; *Ins. Co. of North Am. v. Puerto Rico Marine Mgmt.*, 599 F. Supp. 199 (D. P.R. 1984); *Home Ins. Co. v. Puerto Rico Maritime Shipping Auth.*, 524 F. Supp. 541 (D. P.R. 1981); *Com. Petrochemicals, Inc. v. S/S Puerto Rico*, 455 F. Supp. 310 (D. Md. 1978).

▮ Las disposiciones de C.O.G.S.A., contrario a la Ley Harter, tienen una cubierta limitada en cuanto al periodo del transporte marítimo. Por sus términos se limita a regular los derechos y obligaciones entre el consignatario y el porteador o su agente *durante el tracto de flotaje*, 46 U.S.C. sec. 1301, esto es, desde que se embarcan los bienes en el navío hasta su descargo en el puerto. Véanse: *Archilla v. Smyth Worldwide Movers*, supra, pág. 542; *Rhode Island Ins. Co. v. Pope & Talbot Lines*, supra, pág. 464; Longley, *op. cit.*, Secs. 1.06 y 11.01; W. Poor, *American Law of Charter Parties and Ocean Bills of Lading*, 5ta ed., Nueva York, Ed. Mathew Bender, 1968, Sec. 61; Gilmore and Black, *op. cit.*, pág. 147.

IV

▮ Además de la Ley Harter y de C.O.G.S.A., los deberes del agente embarcador también surgen del contrato de transporte y de las funciones inherentes a su cargo que lo hacen responsable de estibar, despachar y entregar la carga diligentemente.

▮ Sin embargo, el porteador o su agente no pueden, mediante el contrato de embarque, liberarse de responsabilidad por daños derivables de su propia culpa al cargar, custodiar o *entregar la mercancía*. Respecto a las secs. 190–196 (46 U.S.C.) de la Ley Harter, que versan sobre el período luego de desembarcada la mercancía, se ha expresado lo siguiente:

. . . [I]t was clearly the intention of Section 1 of the Harter Act to declare invalid those clauses which undertake to relieve carrier of

its obligation to exercise *due diligence* to make "proper delivery" of cargo. (Énfasis suplido.) *Levatino Company v. American President Lines, LTD*, 233 F. Supp. 697, 701 (1964).

No obstante, se ha reconocido que el porteador y consignatario pueden convenir, en el conocimiento de embarque, extender las defensas y limitaciones de responsabilidad consignadas en C.O.G.S.A. a los estibadores o agentes. *Grace Line, Inc. v. Todd Shipyards Corporation*, 500 F.2d 361 (9no Cir. 1974). Este tipo de cláusula, que limita contractualmente la responsabilidad bajo C.O.G.S.A., es comúnmente conocida como la *Himalaya clause*. La validez de dicha cláusula ha sido sostenida por los tribunales. Al respecto expresa Tetley, *op. cit.*, que:

> Today the Himalaya clause benefitting the stevedore and the terminal operator is valid in the United States in virtue of *Herd v. Krawill* . . . .

Sin embargo, tal cláusula no puede establecer una *inmunidad absoluta* de responsabilidad, sino meramente limitada. Sobre el particular, el Tribunal Federal de Apelaciones para el Noveno Circuito, al discutir la diferencia entre la limitación de responsabilidad y la exención de la misma, ha expresado con relación a este tipo de cláusula que:

> It is the holding of this court that a contract, no matter how clear and express, which purports *wholly to immunize a non-carrier* from liability for its negligence, is repugnant to traditional law and sound policy. . . . "This distinction between a limitation on liability and an exemption from liability is crucial. A limitation, unlike an exemption, does not induce negligence." (Énfasis en el original.) *Grace Line, Inc. v. Todd Shipyards Corporation*, supra, pág. 373.

El porteador o su agente no pueden inmunizarse contractualmente por la responsabilidad dimanante de sus actos negligentes.

## V

En el caso de autos, aunque se trata de transporte de mercancía desde un país extranjero, C.O.G.S.A. *no* es applicable

debido a que la pérdida ocurrió *después que la mercancía fue descargada y llevada a un almacén*. Además, un examen cuidadoso del conocimiento de embarque refleja que las partes no incorporaron las disposiciones de C.O.G.S.A. para que ésta rigiera los derechos y las obligaciones de las partes durante el período posterior a la descarga. 46 U.S.C. sec. 1307; *Archilla v. Smyth Worldwide Movers*, supra.[1]

## VI

■ Tampoco es de aplicación la ley local, en particular el Art. 1802 del Código Civil, supra, al caso de autos. Este no es un caso apropiado donde los tribunales locales puedan poner en vigor legislación estatal que no contravenga los principios del derecho marítimo federal. *León v. Transconex Inc.*, supra. Aquí se trata de una reclamación por daños sufridos por el alegado incumplimiento de una obligación contractual del contrato de embarque marítimo, cuya génesis es del deber impuesto al estibador por la autoridad conferida por legislación del derecho marítimo federal, en este caso particular, la Ley Harter.

■ Ya hemos visto que la Ley Harter dispone que la responsabilidad del porteador por la mercancía no termina cuando la mercancía es descargada; la misma se extiende hasta que ocurra una entrega apropiada (*proper delivery*).[2]

Debemos resolver si se efectuó la entrega apropiada (*proper delivery*) en el caso ante nos para poder determinar la responsabilidad de las partes a la luz de dicha ley federal.

---

(1) En el contrato de embarque de autos lo único que se limitó fue la responsabilidad del porteador o su agente a 1,250 florines el paquete. Tal limitación se vislumbra válida siempre y cuando, al momento de efectuarse el contrato, la conversión de esa cantidad pactada no sea menor de los $500 dólares por paquete que como limitación impone la Ley sobre Transporte Marítimo de Mercancía —*Carriage of Goods by Sea. Act* (C.O.G.S.A.)— 46 U.S.C. sec. 1304(15). Si dicha cantidad de florines resultara menor de $500 dólares, la limitación sería nula por contravenir la ley.

(2) La Ley Harter no define el concepto *proper delivery*. El mismo ha sido interpretado caso a caso por los tribunales.

400

En *Kinderman & Sons v. Nippon Yusen Kaisha Lines*, 322 F. Supp. 939, 941 (E.D. P. 1971), el Tribunal de Distrito Federal de Pennsylvania se enfrentó a la controversia de si se había o no efectuado el *proper delivery* requerido por la ley. Sobre el particular expresó lo siguiente:

> The carrier may discharge the goods onto a fit and customary wharf *provided due and reasonable notice is given to the consignee and he is given a fair opportunity to remove the goods or place them under proper care and custody.* (Énfasis suplido.)

En *Kinderman & Sons v. Nippon Yusen Kaisha Lines*, supra, el tribunal resolvió, como cuestión de hecho, que se le había notificado al consignatario que la mercancía había llegado y estaba a su disposición el 8 de junio de 1965. El 15 de junio del mismo año ocurrió un fuego donde se perdió la mercancía. El tribunal entendió que se efectuó la entrega según la Ley Harter, ya que el consignatario fue *debidamente notificado* y tuvo la oportunidad de mover la mercancía del almacén. Señaló el tribunal:

> As defendant made a proper delivery of the cargo to the plaintiff, the risk of loss passed to plaintiff for any loss not occasioned by negligence on the part of the defendant. The burden of proof of such negligence is on plaintiff, as once there has been a proper delivery of cargo, the Harter Act no longer applies to the relationship of the parties. *Kinderman & Sons v. Nippon Yusen Kaisha Lines*, supra, pág. 942.

En *Orient Overseas Line v. Globemaster Balti, Inc.*, 365 A.2d 325, 335 (Md. App. 1977), el Tribunal Especial de Apelaciones de Maryland distinguió dos (2) situaciones dentro del concepto de *proper delivery*:

> "Proper delivery" within the provisions of this act [Harter Act] means either *actual* or *constructive* delivery. *Actual delivery* consists in *completely transferring the possession and control* of goods from the vessel *to the consignee* or his agent. *Constructive delivery* occurs where the goods are discharged from the ship upon a fit wharf and the *consignee receives due and reasonable notice that the goods have been discharged* and has *a reasonable opportunity to remove the goods* to put them under proper care and custody. (Énfasis suplido.)

En el caso de autos el tribunal de instancia, como cuestión de hecho, determinó que el señor Soto *no recibió notificación sobre la llegada de su mercancía.* El demandado presentó el testimonio del encargado de enviar los avisos de llegada de mercancía, Sr. Fernando Santiago Seijo, a los efectos de que éste envió la notificación entre las miles que enviaba por correo ordinario. Sostuvo, además, que no había ninguna obligación en efectuar la notificación. Se presentó también una alegada copia de la notificación enviada a Soto. El tribunal de instancia, sin embargo, nunca creyó[3] que la alegada copia de notificación fue enviada al señor Soto. Así se desprende de su Resolución de 28 de marzo de 1985, donde señaló:

> Era deber de la Caribe Shipping notificar al consignatario de cuándo y dónde se recibiría la mercancía para que éste se personara y pudiera recoger la misma. *La prueba testifical aportada sobre el envío de la notificación no logró establecer, a nuestro juicio, que dicho envío se hubiese efectuado diligentemente y que hubiese un interés de que el consignatario recibiese el mismo. Tampoco se demostró que se hubiera realizado acorde con lo aquí expresado, en el sentido de que el aviso debió enviarse una vez el barco estuviera preparado para descargar. Por el contrario, se alegó que no había ninguna obligación de la demandada en efectuar la notificación, sin embargo, señalan que son los encargados de enviar los avisos y que de hecho han enviado miles.* (Énfasis suplido.) *Exhibit* 10, pág. 33.

El tribunal, al reconsiderar su Resolución de 28 de marzo de 1985, mediante su Sentencia de 14 de julio de 1987 *ratificó* la determinación de hechos de la primera a los efectos de que, como cuestión de hecho, el señor Soto nunca recibió notificación alguna de Caribe Shipping Co., Inc. A esos efectos expresó en el párrafo 10 de las determinaciones de hechos de su sentencia lo siguiente:

---

[3] No le corresponde a este Foro pasar juicio sobre la credibilidad que determinado testigo le mereció al foro de instancia y determinar si en este caso se hizo o no el envío de la notificación, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *A.E.E. v. Las Américas Trust Co.,* 123 D.P.R. 834 (1989); *Torres Ortiz v. Plá,* 123 D.P.R. 637 (1989).

10. El señor Pedro Juan Soto, como *cuestión de hecho nunca recibió el documento de notificación indicado en el apartado anterior.* (Énfasis suplido.)

Al cambiar su razón de decidir en dicha sentencia, a los efectos de que el fuego fue fortuito y que Caribe Shipping Co., Inc. al enviar el baúl al almacén no fue la causa próxima del daño causado, el tribunal no consideró las doctrinas legales sobre entrega real o constructiva.(4)

Además, *la prueba que tuvo ante sí el foro de instancia rebatió la presunción* establecida por la Regla 16(24) de Evidencia, 32 L.P.R.A. Ap. IV, a los efectos de que una carta dirigida y cursada por correo debidamente fue recibida en su oportunidad. *Hawayek v. A.F.F.*, 123 D.P.R. 526 (1989).

Por consiguiente, concluimos que en este caso no hubo entrega *real* ni *constructiva* de la mercancía. El señor Soto no

---

(4) · Discrepamos del análisis que hace el compañero Juez Asociado Señor Negrón García, sobre tal sentencia en su opinión disidente.

También discrepamos de su posición en cuanto sostiene que el señor Soto estipuló en el *Exhibit* A y en el *Exhibit* XI la notificación supuestamente hecha por *Caribe Shipping Co., Inc.*

El *Exhibit* A estipulado por las partes fue *fotocopia del conocimiento de embarque (bill of lading)* enviado por Fernando Roqué, Transportes Internacionales, S.A., el porteador. La supuesta notificación enviada por Caribe Shipping Co., Inc. *nunca fue* estipulada. Así surge con meridiana claridad de la Minuta de 30 de enero de 1979 (Autos Originales, pág. 39), la cual literalmente lee como sigue:

"*Exhibit* A – de ambas partes (Fotocopia de conocimiento de embarque, enviada por Fernando Roqu[é] al Sr. Pedro Juan Soto."

Además, de la referida minuta surge que se estipuló como *Exhibit* XI lo siguiente:

"*Carta* con fecha 19 de julio de 1976, acompañando conocimientos de embarques."

Dicha carta, fechada el 19 de julio de 1976, es de Fernando Roqué al Sr. Pedro Juan Soto donde le comunicaba que el baúl y los efectos personales fueron despachados de aduana de España y reexpedidos a su destino final en Puerto Rico, e incluía supuestamente dos (2) originales y dos (2) copias del conocimiento de embarque según fue expedido en el puerto de embarque. En los autos sólo se incluyó una copia marcada como original con un sello y otra copia marcada con un sello como *non-negotiable copy. Ninguna de dichas copias es una notificación de Caribe Shipping Co., Inc.* de que se había recibido la mercancía en Puerto Rico.

No podemos interpretar que se estipuló la notificación de *Caribe Shipping Co., Inc.* cuando durante todo el pleito, que comenzó el 20 de abril de 1977 —hace *14 años*— las partes y el propio tribunal *a quo* siempre han considerado el asunto de la notificación como uno de los más importantes en controversia, litigándolo y argumentándolo extensamente, incluso ante este Foro. Ello implicaría imputarles un esfuerzo en futilidad al tribunal de instancia y a las partes.

tuvo la posesión o control físico de sus bienes ni tampoco recibió la notificación debida de que su mercancía había llegado de forma que tuviera una oportunidad razonable de recogerla. Véanse: Watkins, *Shippers and Carriers*, 5ta ed., Atlanta, The Harrison Co., 1962, Vol. 1, Sec. 2–25; 2B *Benedict on Admiralty* Sec. 33 (1991); Poor, *op. cit.*, Sec. 61; *General Refrigerator Corp. v. Acme Fast Freight*, 60 N.Y.S. 2d 370 (1975).

■ Hasta tanto no se efectúa la entrega apropiada *"proper delivery"*, la Ley Harter hace responsable al porteador por los daños y perjuicios *contractuales* ocasionados con la pérdida de la mercancía. Véase J.B. Doak, *Liabilities of Stevedores, Terminal Operators, and Other Handlers in Relation to Cargo*, 45 Tul. L. Rev. 752 (1971).

■ Por lo anterior resolvemos que Caribe Shipping Co., Inc. es responsable por los daños y perjuicios ocasionados al señor Soto a consecuencia de la pérdida de su mercancía.(5)

## VII

■ El segundo error fue cometido. El tribunal de instancia debió imponer a la recurrida el pago de los honorarios de los peritos del recurrente que aquélla llamó a deponer. Regla 23.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Al efectuarse la toma de deposición, los peritos del recurrente anunciaron que su tarifa sería quinientos dólares ($500). La recurrida expresó que dejaría a la discreción del tribunal la fijación de los honorarios por la comparecencia de los peritos. El tribunal de instancia nada dispuso sobre el asunto.

La recurrida se opuso a la cuantía reclamada por los peritos por considerarla excesiva. En su alegato, en oposición al escrito de revisión, se allanó a que de los ochocientos treinta dólares ($830) reclamados en concepto de honorarios de perito el tribunal

---

(5) No es una norma onerosa y sí una de justicia para los consignatarios de mercancía marítima recibida en Puerto Rico que los porteadores o sus agentes notifiquen adecuadamente por escrito a los primeros del recibo en puerto de dicha mercancía.

aprobara cuatrocientos quince dólares ($415), a lo sumo. Su posición es que el recurrente sólo tiene derecho a quinientos dólares ($500) en su reclamación a tenor con las disposiciones de C.O.G.S.A., 46 U.S.C. sec. 1304, y de conceder ochocientos treinta dólares ($830) por concepto de honorarios de perito se estaría concediendo más, en tal concepto, que a lo que tiene derecho por la reclamación.

■ Trátase aquí de peritos intermedios, acreedores a honorarios adicionales. *San Lorenzo Tra. Inc. v. Hernández*, 114 D.P.R. 704 , 718 (1983). El perito, Prof. Emilio Díaz Valcárcel, es autor de novelas y colecciones de cuentos y profesor de literatura de la Universidad Metropolitana de Cupey. El perito, Sr. Francisco Manuel Vázquez López, es editor, presidente de la Editorial Cultural, Inc. y gerente de Editorial Cultural y su subsidiaria Editorial Antillana, Inc.

El profesor Valcárcel informó a la demandada que el valor de su comparecencia era de quinientos dólares ($500), mínimo que cobraba por una conferencia, por su preparación al efecto y por el examen de la transcripción del caso. El editor Vázquez facturó trescientos treinta dólares ($330) por el tiempo invertido en conseguir los documentos que le requirió la parte demandada en su convocatoria, por la comparecencia misma y por el examen de la transcripción del caso (5 horas y 1/2, a razón de sesenta dólares ($60) la hora).

Habiendo sido advertida la recurrida del monto de los honorarios y teniendo derecho el perito intermedio al pago de honorarios adicionales de quien lo llama a deponer, concluimos que no resulta excesiva la cantidad reclamada por este concepto. Se ordena a la recurrida el pago de dichos honorarios. La indemnización en tal concepto es independiente a la causa de acción del reclamante en este caso. Aquí no se trata del cobro de honorarios de peritos en concepto de costas. *Cf. Meléndez v. Levitt & Sons of P.R.*, 104 D.P.R. 797, 810–811 (1976); *Toppel v. Toppel*, 114 D.P.R. 16, 20–22 (1983).

Por los fundamentos expuestos, *se dictará sentencia para revocar la del foro de instancia y se devuelve el caso para que se adjudiquen los daños según lo resuelto en este recurso y se ordene a la recurrida el pago de honorarios de los peritos a quienes se les tomó deposición.*

El Juez Asociado Señor Negrón García disiente con opinión escrita. El Juez Asociado Señor Rebollo López disiente sin opinión escrita.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

En un tribunal colegiado es natural que a menudo exista pluralidad de opiniones, resultado inevitable de las divergencias de criterios individuales de sus integrantes. De más está decir que la validez intrínseca y persuasiva del dictamen institucional —o disenso— dependerá, no sólo de la solidez de los fundamentos y del estudio doctrinario, sino de la apreciación y exposición fáctica correcta.

Con esta perspectiva en mente, *precisemos* los hechos ante nos.

I

A mediados de 1976 el Sr. Pedro Juan Soto contrató en Barcelona, España, al agente naviero Fernando Roqué, Transportes Internacionales S.A. (Fernando Roqué), para el transporte de un baúl con efectos personales desde Zaragoza hasta el puerto de San Juan. Se hizo constar a sí mismo consignatario, con dirección en Condominio Q, Quintana, 6013-A, Hato Rey, Puerto Rico, 00917.

El 12 de julio de 1976 Fernando Roqué embarcó el baúl en el navío AMERSFOORT, de la línea holandesa Koninklijke Nederlandsche Stoomboot-Maatschappij, (K.N.S.M.). En carta fechada 19 de julio así se lo notificó al señor Soto y *le remitió el original y copia* del *conocimiento de embarque (bill of lading).*

406

Estos documentos fueron marcados *Exhibit* XI de los demandantes. El señor Soto los recibió a fines de ese mes.

Alrededor del 23 de julio, Caribe Shipping Co., Inc. (Caribe Shipping), agente naviero *local* de la firma K.N.S.M., *le envió al señor Soto una copia del conocimiento de embarque sellada con un "Aviso de LLegada".* En *sello estampado* se le indicaba que la carga llegaría a Puerto Rico el 27 de julio, y se le advertía que de no ser levantada para el 3 de agosto de 1976 sería enviada a un almacén de adeudos público. Según testificó la persona encargada de hacer estas notificaciones, ello se hizo por correo ordinario, tal como era la costumbre con todos los avisos de llegada. *Fotocopia de este documento, con esa notificación, fue presentado como evidencia en instancia e identificado como "Exhibit A" de ambas partes. Minuta de 30 de enero 1979 (A.O. 39).*

Esta notificación, según declaró el propio señor Soto, no la recibió. Así lo determinó el foro de instancia.

El 26 de julio de 1976 la embarcación AMERSFOORT arribó a San Juan, donde Caribe Shipping realizó la operación de desembarque. Toda vez que transcurrieron cinco (5) días desde su llegada sin que el baúl fuese reclamado, el Servicio Federal de Aduanas lo envió a un almacén de adeudos localizado en el área de Miramar. Ello se hizo a tono con la legislación y reglamentación federal de aduanas. 19 U.S.C. sec. 1490(a) *et seq.*; 19 C.F.R. sec. 127 *et seq.* En consecuencia, Caribe Shipping perdió, *por operación de ley, la posesión jurídica y el control físico del baúl.*

Posteriormente, el 19 de agosto de 1976, un incendio se propagó hacia dicho almacén y destruyó el baúl y su contenido. El señor Soto se enteró el 4 de noviembre cuando, preocupado por el tiempo que había transcurrido, escribió a la firma Fernando Roqué inquiriendo sobre el estado del embarque. Después reclamó a Caribe Shipping y a Fernando Roqué. Al resultar infructuosas esas gestiones, el 20 de abril de 1977 el señor Soto y su esposa, la Sra. Carmen Lugo Filippi, interpusieron ante el Tribunal Superior, Sala de San Juan, la presente acción contra Caribe Shipping.

Inicialmente dicho tribunal (Hon. Juan A. Arill Miranda, Juez) impuso responsabilidad pero después, por vía de reconsideración, desestimó la demanda. Inconformes, recurrieron.

## II

No podemos suscribir la opinión mayoritaria que, aunque describe ciertas normas de derecho pertinentes, impone *errónea-mente* responsabilidad a Caribe Shipping. Se fundamentan en que el "tribunal de instancia, sin embargo, *nunca creyó* que la alegada copia de notificación fue enviada al señor Soto". (Énfasis suplido y escolio omitido.) Opinión mayoritaria, pág. 401. ESTE ASERTO MAYORITARIO, TAN CRUCIAL, ES *INCORRECTO.*

*Primero,* según expuesto, *ambas partes* sometieron como evidencia el *Exhibit* A, esto es, la *fotocopia* del *conocimiento de embarque con el sello del aviso de llegada del baúl que se le remitió al señor Soto por correo ordinario.* Su envío fue objeto de testimonio *no contradicho* del señor Fernando Santiago Seijo, empleado de Caribe Shipping encargado de esa gestión. ¿Cómo negarle valor real y total a esa prueba? ¿Por qué limitarla y excluir la notificación que de su faz surge?

Aparentemente la mayoría se niega a reconocer que este documento —aunque según la minuta es una "fotocopia del *conocimiento de embarque* enviado por Fernando Roqué al Sr. Pedro Juan Soto"— fue *estipulado* por *ambas partes* (*Exhibit* A) y que se *distingue* de cualquier otro precisamente por el *sello* de *notificación* al señor Soto *estampado* por *Caribe Shipping*. Es un grave error pensar que se trata simplemente del *conocimiento de embarque remitido directamente* por Fernando Roqué al señor Soto. Repetimos, la mayoría no ha tomado en cuenta esa *diferencia* importante entre el *Exhibit* A de *ambas partes* y el *Exhibit* XI del demandante. Este último sí representa el *original* y *copia* de ese *conocimiento de embarque*; claro está, *sin* el sello con la notificación al señor Soto.

La renuencia mayoritaria a adjudicarle el verdadero valor a ese documento radica en esa confusión. Quizás ello explica la

premisa *inarticulada* mayoritaria, a saber, que Caribe Shipping tenía que usar un documento *distinto* para cursar la notificación y no podía utilizar una copia del *conocimiento de embarque con el sello estampado anunciándole al señor Soto la fecha de llegada del vapor.* Desconocemos disposición legal alguna que imponga este requisito, ajeno a una práctica que ha sido efectiva en miles de casos en esta importante industria.

Y *segundo,* frágilmente la mayoría descansa en una Resolución de 28 de mayo de 1985 para sostener que el tribunal de instancia no creyó que Caribe Shipping notificó al señor Soto. Al hacerlo *pasa por alto* que ese dictamen fue *reconsiderado posteriormente* por dicho foro en su Sentencia de 14 de julio de 1987, en que declaró *sin lugar* la demanda. En esta última ocasión, al respecto *sólo* reafirmó:

> 9. La demandada alega que notificó a la demandante la llegada del baúl, enviándole por correo ordinario tres días antes del arribo del buque, una copia del conocimiento de embarque en la cual se había estampado un sello denominado "Aviso de llegada de carga" que indicaba que la carga llegaría el 27 de julio de 1976 y que, de no ser levantada a tiempo, "esta carga será enviada a un almacén público aproximadamente Aug. 3, 1976." *Este procedimiento era el que acostumbraba utilizar la parte demandada para avisar a los consignatarios la llegada de la mercancía destinada a ellos.*
>
> 10. El señor Pedro Juan Soto, como cuestión de hecho *nunca recibió* el documento de notificación indicado en el apartado anterior. (Énfasis suplido.) *Exhibit* 1, págs. 4–5.

*FUERA DE ESTAS EXPRESIONES,* EN LA SENTENCIA *NO HAY NINGUNA OTRA DETERMINACIÓN* FÁCTICA QUE SOSTENGA LA CONCLUSIÓN MAYORITARIA. De la lectura del transcrito párrafo 9 se desprende que, como cuestión de realidad, el tribunal de instancia *reconoció el procedimiento de notificación* que seguía siempre Caribe Shipping. Distinto a la conclusión mayoritaria, no adjudicó —ni siquiera *mencionó*— extremo alguno referente a la credibilidad de la prueba de notificación. Ese silencio contrasta elocuentemente con las trece (13) determinaciones de hecho anteriores que *taxativa* y "*detalla[damente] reafirmó*" en su sentencia.

Y es que, al reiterar algunas determinaciones de hecho y *rechazar otras*, el tribunal de instancia actuó en virtud de la facultad que le fue conferida por las reglas procesales. Incluso podía variarlas. *Rosario Crespo v. A.F.F.*, 94 D.P.R. 834, 846 (1967). Tan es así que dijo: "La determinación de si *la demandada* [*Caribe Shipping*] *notificó o no del arribo del baúl* es una que para efectos de las conclusiones de derecho *no* abona elemento sustancial alguno." *Exhibit* 1, pág. 7.

Esta fraseología —"si la demandada *notificó o no* del arribo del baúl"— dista mucho y choca frontalmente con la postura mayoritaria. El enfoque del tribunal de instancia es perfectamente *comprensible*. No podía negarse a reconocer lo que claramente surgía del sello estampado en el *Exhibit* A de *ambas partes*: copia del aviso de llegada del baúl que se le remitió al señor Soto por correo ordinario.

El error en la tesis mayoritaria radica en entremezclar y tratar —*como si fueran actos iguales*— la *notificación enviada* por *Caribe Shipping* y la circunstancia de que *no* fue *recibida* por el señor Soto.

Evidentemente la determinación mayoritaria de que el tribunal de instancia "nunca creyó que la alegada copia de notificación fue enviada al señor Soto" —(escolio omitido) opinión mayoritaria, pág. 401— es *UNA ESPECULACIÓN QUE RESULTA INCOMPATIBLE CON LA SENTENCIA. ADEMÁS, ES CONTRARIA A LA PRUEBA DOCUMENTAL ESTIPULADA Y A LA TESTIFICAL NO CONTRADICHA PRESENTADA*. En este aspecto, es un *contrasentido* que en la pág. 401 esc. 3 la mayoría invoque la regla de no "pasar juicio sobre la credibilidad que determinado testigo le mereció al foro de instancia" *para hacer lo opuesto, a saber, atribuirle al juez unas adjudicaciones de credibilidad que no hizo*.

### III

No podemos, pues, imputarle a Caribe Shipping falta de diligencia. LA RAZÓN ES CLARA: *RESULTÓ PROBADO QUE*

*ENVIÓ LA CARTA.* Únicamente se destruyó la presunción consagrada en la Regla 16(24) de Evidencia, 32 L.P.R.A. Ap. IV, de que la notificación fue debida y oportunamente *recibida,* mas subsistió el hecho de que *fue remitida al señor Soto.* Véase *Díaz de Diana v. A.J.A.S. Ins. Co.,* 110 D.P.R. 471, 477–478 (1980).

La opinión mayoritaria olvida que esta "presunción está basada en el hecho de que la oficina de correos es una agencia pública encargada por ley con el deber de trasmitir y entregar el correo, en unión a que como regla general, la correspondencia es oportunamente entregada . . .". (Traducción nuestra.) 1 *Jones on Evidence* Cap. 3, Sec. 3:41, pág. 203 (1972).

Si la maquinaria postal gubernamental se tarda o falla en entregarla, ¿qué mayor diligencia puede requerírsele al agente naviero que por disposición de ley sólo tiene bajo su posesión y control una carga por el *corto* período de cinco (5) días? ¿Es que no basta la notificación por correo ordinario? ¿No es suficiente prueba *fotocopia* del documento sellado (estipulado por *ambas* partes) y el testimonio incontrovertido del funcionario Santiago Seijo? ¿No estará la mayoría requiriendo, *sub silentio,* una notificación *más formal?* De ser así, ¿deberá ser por correo certificado? ¿Hacerse personalmente?

Ante estas alternativas, ¿el tiempo de cinco (5) días será suficiente? De igual forma, ¿debemos imponerle al agente el deber de visitar el almacén de adeudos para averiguar qué carga ha sido realmente reclamada por los consignatarios?

## IV

La doctrina prevaleciente reconoce que la responsabilidad del transportista y, por ende, de su agente naviero *finaliza* cuando se lleva a cabo una entrega apropiada de la carga, sea *real* o *constructiva.* La determinación judicial de que ha mediado una entrega *constructiva* implica examinar los usos y costumbres del puerto de llegada, las gestiones realizadas por el agente naviero para lograr una entrega real, la *diligencia mostrada por el consignatario* y, finalmente, la legislación y reglamentación aplicables.

En el caso ante nos no podía requerírsele a Caribe Shipping el envío de notificaciones *posteriores*. EL BAÚL NO ESTABA BAJO SU CUSTODIA O CONTROL, SINO EN UN ALMACÉN ASIGNADO POR EL SERVICIO FEDERAL DE ADUANAS. MÁS AÚN, CARIBE SHIPPING DESCONOCÍA EL *STATUS* DE SU ENTREGA.

## V

Por último, como *fundamento adicional*, cabe señalar que no fue hasta pasados más de tres (3) meses de su llegada al puerto de San Juan que el señor Soto comenzó a indagar sobre el baúl. Según la prueba desfilada, ésta no era la primera vez que hacía envíos desde España. Desde fines de julio, el señor Soto *había sido avisado* de que el baúl *estaba en camino*. Conocía, además, el nombre del vapor y su destino. En estas circunstancias, *sus gestiones fueron tardías e injustificadas*.

EN RESUMEN, LA EVIDENCIA DEMUESTRA QUE CARIBE SHIPPING CUMPLIÓ CON EL DEBER DE NOTIFICACIÓN Y, ADEMÁS, QUE REALIZÓ UNA *ENTREGA CONSTRUCTIVA DEL BAÚL*. CON ELLO, SE DESLIGÓ TOTALMENTE DE LA RELACIÓN CONTRACTUAL QUE LE UNÍA AL SEÑOR SOTO. LA FALTA DE DILIGENCIA DEL SEÑOR SOTO CONTRASTA DESPROPORCIONADAMENTE CON LA RESPONSABILIDAD DE CARÁCTER ABSOLUTA IMPUESTA POR ESTE TRIBUNAL A CARIBE SHIPPING.

Confirmaríamos la sentencia.