ELÍAS LÓPEZ SOBÁ, demandante y recurrido, *v.* RICHARD FITZGERALD, BILL EMBREE, MIKE WOODS y OTROS, demandados y recurrentes.

*Número:* RE-88-283 *Resuelto:* 2 de marzo de 1992

48

*Francisco R. Moya Huff,* abogado de los recurrentes; *José E. Alfaro Delgado,* abogado de la parte interventora; *Rafael Ortiz Carrión, Procurador General, Carlos M. Vergne Vargas, Procurador General Auxiliar,* y *Vannessa Ramírez, Procuradora General Auxiliar,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Acordamos revisar el dictamen emitido por el Tribunal Superior de Puerto Rico que concluye que el Estado Libre Asociado de Puerto Rico es el propietario de un astrolabio y otros artefactos de un buque hundido en aguas territoriales de Puerto Rico que fueron hallados por los recurrentes en el fondo del mar. Confirmamos.

# I

Durante 1986 los señores Richard Fitzgerald, Bill Embree y Mike Woods, aficionados al buceo, llevaron a cabo una expedición de búsqueda y salvamento en el fondo del mar en la playa *Black Eagle* del municipio de Rincón. En dicha área se hallaban los restos de un buque náufrago que se cree que data del siglo diecisiete.[1] El grupo de buzos extrajo varios objetos de las inmediaciones del naufragio tales como tijeras, clavos, alfileres, un cañón, una bala de cañón y otros objetos de madera y hierro.

Posteriormente, los señores Harry E. Hauck y Carlos Rivera Dávila se unieron al grupo. Asistido por un detector de metales, el 28 de febrero de 1987 Rivera Dávila encontró el anillo de un ancla, varios cañones y un astrolabio en el que aparecía grabado el año 1616.[2]

Tras el hallazgo, Fitzgerald condujo el astrolabio hasta el restaurante *Black Eagle*, propiedad de Embree. Debido a una disputa entre Woods, Fitzgerald y Embree, miembros de la expedición original, los señores Hauck y Rivera Dávila dieron cuenta al Instituto de Cultura Puertorriqueña (en adelante el Instituto) de los objetos hallados.

El trámite procesal del pleito se inició cuando el 10 de agosto de 1987 el Director Ejecutivo del Instituto de Cultura acudió ante la Sala de Aguadilla del Tribunal Superior en Solicitud de *Injunction* Provisional, Preliminar y Permanente y Sentencia Declaratoria. Adujo que los objetos encontrados constituían reliquias o valores arqueológicos que forman parte del acervo histórico cultural de Puerto Rico. Reclamó para el Estado Libre Asociado el tí-

---

[1] Se encuentra localizado en los 18 grados 20.5 minutos de latitud norte y los 67 grados 14.7 minutos de longitud oeste. La ubicación del naufragio lo sitúa a unos 450 metros de la costa, esto es, dentro de las aguas territoriales de Puerto Rico.

[2] Un astrolabio es un instrumento que se utilizaba en la antigüedad para observar la altura de los astros y resolver por métodos gráficos los problemas corrientes de la astronomía y la navegación. *Enciclopedia Universal Sopena*, Barcelona, Ed. Ramón Sopena, 1966, pág. 793.

tulo de propiedad sobre los artefactos y solicitó la devolución de los mismos para ponerlos bajo la custodia del Instituto. Además, solicitó al Tribunal Superior que ordenara a los buzos cesar y desistir de realizar otras expediciones con el propósito de apropiarse de valores arqueológicos sumergidos en el mar.

Por su parte, el señor Fitzgerald expuso que él era el titular no sólo de los bienes que había encontrado sino también de la totalidad del naufragio. Argumentó que había adquirido los artefactos por ocupación. Sostuvo que no había legislación ni reglamentación del Instituto que dispusiera que la titularidad de los objetos hallados en el fondo del mar correspondiera al Estado Libre Asociado, y que, por lo tanto, lo que aplicaba era la ley marítima federal sobre salvamento.

El 31 de agosto de 1987 el Tribunal Superior dictó una resolución, mediante la cual concedió al Instituto de Cultura la custodia del astrolabio, ordenó el traslado del mismo al Archivo General de Puerto Rico en San Juan y ordenó la realización de una tasación del astrolabio. En cumplimiento de esta orden el astrolabio fue entregado al Instituto.

Así las cosas, los señores Rivera y Hauck, quienes participaron en la expedición en la que se encontró el astrolabio, solicitaron intervención en el pleito y presentaron Demanda de Coparte contra Fitzgerald y los otros. Alegaron que, al amparo del derecho marítimo federal, el astrolabio y los objetos hallados advenían a ser de su propiedad, a modo de compensación por la labor y destreza desplegada para recuperarlos. La intervención fue concedida el 15 de diciembre de 1987.

Tras varios incidentes procesales, incluyendo la presentación de una acción *in rem* ante la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico que fue desestimada, el foro de instancia emitió el dictamen recurrido mediante el cual declaró al Estado Libre Asociado de

Puerto Rico (en adelante E.L.A.) propietario del "astrolabio y los demás objetos de valor encontrados en la playa Black Eagle del Municipio de Rincón". *Exhibit* IV, pág. 12. También, adjudicó la custodia y conservación de todos los bienes al Instituto. Su decisión estuvo fundamentada en el Art. 557 del Código Civil, 31 L.P.R.A. sec. 1958, la Ley de Puertos española de 1880 —que fue extendida a Puerto Rico por Real Decreto el 5 de febrero de 1886— y los Arts. 5 y 6 del Código Político, 1 L.P.R A. secs. 2 y 3.

Por último, el tribunal *a quo* ordenó a las partes someter sus argumentos sobre la compensación a la cual pudieran tener derecho los demandados e interventores por haber recuperado el astrolabio y los otros artefactos.

De la decisión del tribunal recurren Fitzgerald, Woods y Embree. Alegan que los bienes encontrados en el naufragio habían sido abandonados y que, conforme al Art. 550 del Código Civil, 31 L.P.R.A. sec. 1951, ellos los adquirieron a título de ocupación. También aducen que la Ley de Puertos de 1886 es inaplicable, y que el foro de instancia incurrió en error al no reconocer que en ausencia de legislación local prevalece la Ley Federal de Almirantazgo. En particular, sostienen que la controversia de autos se rige por las doctrinas de "hallazgo" y "salvamento" del derecho marítimo federal y que por tratarse de una acción *in rem* el tribunal de instancia no tenía jurisdicción por ser ésta una cuestión litigable exclusivamente en el foro federal. Por último, exponen que el Tribunal Superior se equivocó al otorgarle el título de propiedad al E.L.A., que no es una parte en el litigio. Expuestos los hechos y el trámite procesal del caso, evaluemos los señalamientos de los recurrentes.

## II

En primer lugar, examinemos si el E.L.A. es una parte en este pleito. El recurrente sostiene que el Instituto es una entidad separada del E.L.A. y, por ende, este último no

está facultada para representarlo. Por su parte, el Procurador General expone que el E.L.A. es el dueño de los bienes provenientes de un buque náufrago descubierto en los terrenos sumergidos bajo las aguas sobre las que ejerce dominio. Aduce que, como el Director Ejecutivo del Instituto reclamó el título de los bienes encontrados para el E.L.A., ésta es justamente la parte interesada en la acción.

■ Como cuestión de derecho, la Ley Núm. 75 de 31 de julio de 1985, que reorganizó el Instituto, establece que dicha entidad tendrá como propósito "conservar, promover, enriquecer y divulgar los valores culturales *puertorrique-ños* y lograr el más amplio y profundo conocimiento y aprecio de los mismos". (Énfasis suplido.) 18 L.P.R.A. sec. 1195. Con estos propósitos se le otorgó al Instituto la autoridad para "[c]onservar, custodiar, restaurar y estudiar los bienes muebles e inmuebles, corporales o incorporales de valor para el mejor conocimiento del patrimonio histórico cultural del pueblo de Puerto Rico, y poner este conocimiento al alcance del público ...". 18 L.P.R.A. sec. 1198(a)(1). En el descargo de estas funciones, se le delegó al Instituto el poder de adquirir "cualesquiera bienes muebles e inmuebles, corporales o incorporales, o cualquier derecho o interés sobre ellos ...". 18 L.P.R.A. sec. 1198(b)(4).

■ También se faculta al Director Ejecutivo del Instituto a promover las acciones legales correspondientes para la consecución de los fines que persigue el Instituto. 18 L.P.R.A. sec. 1198(a)(1) y (b)(1). Entre otros, se concede poder al Instituto "para iniciar y tramitar procedimientos para la expropiación forzosa, a nombre del Estado Libre Asociado de Puerto Rico, de cualesquiera bienes, muebles e inmuebles, corporales o incorporales, o de cualquier derecho o interés sobre los mismos, que fueren necesarios para dar cumplimiento a los fines y propósitos de las secs. 1195 a 1201 de este título". 18 L.P.R.A. sec. 1198(b)(4).

56

■ De los autos surge que la acción fue promovida por el Director Ejecutivo en beneficio del E.L.A. y, de hecho, éste siempre fue representado por el Departamento de Justicia, conforme lo dispuesto en el Art. 64 del Código Político (1902), 3 L.P.R.A. sec. 72.([3]) También se desprende que desde el inicio del pleito, el Director Ejecutivo del Instituto se propuso recuperar unos bienes de gran valor histórico y cultural que expresamente alegó ser propiedad del E.L.A.([4])

Al tomar en consideración los propósitos del Instituto, y que sus funciones se llevan a cabo única y exclusivamente para el beneficio del Pueblo de Puerto Rico, el señalamiento de error sobre estos extremos es inmeritorio. Aclarada esta cuestión, procede que analicemos la legislación aplicable a la controversia de autos.

---

([3]) Dispone el Art. 64 del Código Político que:
"*Sec. 72. —Representará al Estado Libre Asociado en acciones civiles y criminales*

"El Secretario de Justicia representará al Estado Libre Asociado de Puerto Rico, bien personalmente, o por medio de sus auxiliares o cualquiera de los Fiscales, en todas las demandas y procesos civiles o criminales, en que fuere parte; y cuando fuere requerido por el Gobernador o por cualquier Jefe de Departamento podrá representar también, ante cualquier Tribunal, a cualquier funcionario, empleado o agente del Gobierno Estadual que demandare o fuere demandado en su capacidad oficial .... Código Político, 1902, art. 64; Marzo 8, 1906, p. 25, sec. 1; Const., art. IX, sec. 4; Julio 24, 1952, Núm. 6, p. 11, art. 2; Julio 24, 1952, Núm. 11, p. 31, sec. 1; Julio 24, 1952, Núm. 23, p. 95, art. 1, ef. Julio 25, 1952." 3 L.P.R.A. sec. 72.

([4]) La petición presentada por el Instituto de Cultura Puertorriqueña reclamó para el Estado Libre Asociado la titularidad del astrolabio. En lo pertinente, expresaba:

"De acuerdo con la Ley 89, los objetos, reliquias y artefactos ... representan la categoría de bienes muebles que sin lugar a dudas constituyen parte del acervo histórico cultural del Pueblo de Puerto Rico y que como cuestión de derecho pertenecen al Estado Libre Asociado." Petición, pág. 84.
Más adelante la petición expresaba:

"El demandante a los fines de evitar la usurpación y el despojo de los tesoros arqueológicos que le pertenecen al Estado Libre Asociado ... respetuosamente solicita el que se disponga y ordene para que se le entreguen y se pongan bajo su custodia y control los valores arqueológicos que se mencionan en la demanda o cualesquiera otros que se encuentren en poder de la parte demandada los cuales le pertenecen al Estado Libre Asociado y forman parte del patrimonio histórico y cultural del Pueblo de Puerto Rico." Íd., pág. 85.

## III

■ El derecho marítimo puertorriqueño está estrechamente ligado al desarrollo del derecho marítimo y comercial español. Este, a su vez, se nutre de la legislación de almirantazgo europea que fue transformándose desde la antigüedad. S.E. Casellas, *The Admiralty Jurisdiction in the Commonwealth of Puerto Rico*, 22 (Núm. 2) Rev. C. Abo. P.R. 165 (1962). El Libro III del Código de Comercio Español de 1885 fue la culminación de este proceso. Dicho cuerpo legal fue extendido a Puerto Rico el 28 de enero de 1886, y desde entonces forma parte de las leyes de Puerto Rico.

■ El 7 de mayo de 1880 se aprueba en España, además, otro cuerpo de leyes relevantes al mar que sería de suma importancia en Puerto Rico. La Ley de Puertos española, con las modificaciones necesarias, se hizo extensiva a Puerto Rico por real decreto en el 1886. Desde entonces, la ley española sufrió innumerables enmiendas. El mismo destino no le correspondió a la puertorriqueña. Véase Casellas, *supra*.

■ Después del cambio de soberanía en 1898, la ley marítima vigente en Puerto Rico quedó en estado de suspensión al aprobarse en 1900 la primera ley orgánica para Puerto Rico conocida como la Ley Foraker. La Sec. 13 de la referida ley proveía específicamente que las áreas de muelles y aguas navegables *no* estarían bajo el control del gobierno de la isla. Acta Foraker, 31 Stat. 80, Documentos Históricos, Sec. 13, L.P.R.A., Tomo 1.

■ Diecisiete (17) años más tarde, el Congreso de Estados Unidos aprobó una segunda carta orgánica para Puerto Rico, la Ley Jones. Distinto a la Ley Foraker, esta segunda pieza legislativa en sus Arts. 7 y 8 colocó en manos del Gobierno de Puerto Rico "todas las orillas de los

puertos, muelles, embarcaderos, terrenos saneados y todos los terrenos y edificios públicos", e hizo extensiva a la isla "todas las leyes de los Estados Unidos para la protección y mejoramiento de las aguas navegables de los Estados Unidos ... excepto en aquello en que las mismas sean localmente inaplicables ...". También, puso bajo el dominio del pueblo de Puerto Rico "[l]a superficie de los puertos y los cursos y extensiones de aguas navegables y los terrenos sumergidos bajo ellos ... con sujeción a las mismas limitaciones ... enumeradas en el artículo precedente ...". Acta Jones, 39 Stat. 954, Documentos Históricos, Secs. 7 y 8, L.P.R.A., Tomo 1, ed. 1982, págs. 85 y 86. De este modo el Congreso le transfirió al Gobierno de Puerto Rico cierta propiedad pública incluyendo las aguas territoriales navegables y le confirió el poder para legislar en esta área. Véase Casellas, *supra*, pág. 173.

En 1950 el Congreso de Estados Unidos aprobó la Ley de Relaciones Federales, 48 U.S.C. sec. 731(b) *et seq.* En lo que concierne a los estatutos relacionados con el control de Puerto Rico sobre sus aguas navegables, la aprobación de esta ley no produjo cambio alguno en los Arts. 7 y 8 de la Ley Jones, *supra.* De hecho, éstos fueron reproducidos literalmente en la Ley de Relaciones Federales con Puerto Rico. *Informe sometido a la honorable Junta de Gobierno del Ilustre Colegio de Abogados de Puerto Rico por su Comisión de Derecho Internacional, Derecho del Pueblo de Puerto Rico sobre su mar territorial, sobre sus terrenos sumergidos, sus recursos naturales y sobre su plataforma continental,* 38 Rev. C. Abo. P.R. 455 (1977); R. Rodríguez Antongiorgi, *Review of Federal Decisions on the Applicability of United States Laws in Puerto Rico Subsequent to the Establishment of the Commonwealth of Puerto Rico,* 26 (Núm. 3) Rev. Jur. U.P.R. 321 (1957).

Este Tribunal tuvo la ocasión de expresarse sobre la aplicabilidad del derecho de almirantazgo federal a la

isla en *León v. Transconex, Inc.*, 119 D.P.R. 102 (1987). Allí, al reafirmar la norma de que la cláusula *saving to the suitors*, de la Ley de la Judicatura de 1789, 28 U.S.C. sec. 1333, que confiere jurisdicción para entender en asuntos de almirantazgo tanto a los tribunales federales como a los estatales, aplicaba de igual forma en Puerto Rico, dejamos establecido que "cuando existe jurisdicción concurrente, los tribunales estatales retienen facultad para poner en vigor ... el Derecho marítimo federal". Íd., pág. 111. Véase, además, *Soto v. Caribe Shipping Co., Inc.*, 128 D.P.R. 385 (1991).

Reconocimos también que los tribunales locales tendrían facultad para aplicar el derecho marítimo puertorriqueño. Al resumir cuál era el estado de derecho actual en cuanto a la aplicabilidad del derecho de almirantazgo federal, dijimos en el esc. 10 de la decisión:

> En síntesis, la norma actual mantiene que el Derecho marítimo federal es el aplicable a las controversias de jurisdicción marítima, siempre y cuando la Asamblea Legislativa de Puerto Rico no haya legislado en esa área, en cuyo caso prevalecerá la norma local, a menos que el Congreso expresamente disponga otra cosa. *León v. Transconex, Inc.*, supra, pág. 115.[5]

Procede, por lo tanto, que examinemos si la asamblea legislativa se ha pronunciado en cuanto a la titularidad de los bienes que se encuentran en el mar. De ello dependerá si hemos de aplicar la ley federal de almirantazgo.

## IV

Acudimos, en primer lugar, a las disposiciones del Código Civil que atienden la titularidad de los bienes en

---

[5] Véanse, además: *Lastra v. New York & Puerto Rico S.S. Co.*, 2 F.2d 812 (1er Cir. 1924); *Guerrido v. Alcoa Steamship Co.*, 234 F.2d 349 (1er Cir. 1956); *Lusson v. Carter*, 704 F.2d 646 (1er Cir. 1983); *García v. Friesecke*, 597 F.2d 284 (1er Cir. 1979), entre otros.

general. Allí, en las disposiciones que regulan la figura de la ocupación, encontramos un artículo que atiende este problema, en particular:

> *Art. 557. Objetos arrojados al mar o a la playa y plantas que crezcan en su ribera.*
> Los derechos sobre los objetos arrojados al mar o sobre los que las olas arrojen a la playa, de cualquier naturaleza que sean, o sobre las plantas y hierbas que crezcan en su ribera, se determinan por leyes especiales.

■■ Dicho artículo se origina y es idéntico al Art. 617 del Código Civil español. A la luz de lo dispuesto en el Código Civil, corresponde entonces que analicemos a qué legislación especial se refiere. Manresa, en su conocida obra *Comentarios al Código Civil Español*, explica el origen de esta disposición:

> Se refiere el Código en este artículo a la ley de Puertos de 19 de enero de 1928, a la Ley de Mostrencos y otras especiales.
> Según el art. 1.º del Real decreto de 18 de Mayo de 1909, que modificó la ley de Mostrencos de 9 de Mayo de 1835, se consideran bienes del Estado, y sólo sobre ellos pueden instruirse expedientes y admitirse denuncias, entre otros, los siguientes:
>
> . . . . . . . . . .
>
> 2.º Buques náufragos, sus cargamentos y objetos arrojados por el mar a la playa, sobre los cuales no existan derechos preferentes con arreglo al Código de Comercio y a la ley de Puertos. J.M. Manresa, *Comentarios al Código Civil Español*, 5ta ed. rev., Madrid, Ed. Reus, 1932, T. V, pág. 57.

Sobre este mismo artículo comenta Puig Brutau:

> La legislación especial a la que se refiere este artículo es la de Puertos y la de Patrimonio del Estado. La de Puertos es la de 19 de enero de 1928, pero, como advierte García de Enterría en su "Código de Leyes Administrativas", esta Ley no fue convalidada al revisarse la obra legislativa de la Dictadura y podría entenderse que sigue en vigor la de 7 de mayo de 1880; pero la práctica administrativa y la jurisprudencia de los Tribunales la dan por vigente, aunque en la tabla de disposiciones derogadas que acompaña a la Ley del Patrimonio del Estado, se presume

vigente la de 1880. J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1978, T. III, Vol. 1, pág. 330.

Dicha Ley de Puertos de 1880 se extendió a Puerto Rico por Real Decreto en el 1886, precisamente el mismo año que, con las modificaciones necesarias, se hizo extensivo a Puerto Rico el Código de Comercio.[6] Su Art. 5 expresamente dispone que la titularidad de los bienes arrojados por el mar le pertenece al Estado:

> Pertenece al Estado todo lo que el mar arroje [a] la orilla y no tenga dueño conocido. La Hacienda pública se incautará de ello, pr[e]vio inventario y justiprecio, quedando responsable [a] las reclamaciones de tercero y al pago de los derechos y recompensas de hallazgo y salvamento, con arreglo [a] lo prescrito en las leyes y reglamentos. Art. 5 de la Ley de Puertos de 1880.

Posteriormente, el 14 de julio de 1906, se aprobó otra Ley de Puertos.[7] Sin embargo, esta ley no hacía referencia a ley anterior alguna. La única expresión hecha por el legislador sobre leyes ya vigentes a la fecha de su aprobación está contenida en la Sec. 50 y sólo se refería a la vigencia de las *leyes penales* anteriores. Esta ley, por lo tanto, no tuvo el efecto de derogar la Ley de Puertos de 1886.

Como ocurre con cualquier legislación posterior, en ausencia de una cláusula derogatoria expresa, sólo se considerará derogado del estatuto anterior las secciones

---

[6] La sección cuarta del Libro III del Código de Comercio, 10 L.P.R.A. Ap. II, contiene disposiciones sobre naufragios. No obstante, el articulado no se refiere a buques, que como el del caso de autos, llevan siglos naufragados. Los Arts. 822 al 827 aplican a salvamentos realizados coetáneamente con el naufragio o poco tiempo después. Por no ser aplicable al caso de autos, es innecesario que nos expresemos sobre la vigencia de este cuerpo legal.

[7] Dicha ley fue titulada como "Ley para reglamentar el servicio de muelles y puertos de Puerto Rico", y constaba de cincuenta y una (51) secciones divididas en siete (7) capítulos. Cada capítulo atendía una situación diferente. Así, por ejemplo, el Capítulo II trataba las penas generales, daños y perjuicios, el III las reglas para el servicio de prácticas, el IV los derechos de practicaje, el V los derechos por atracar al muelle, el VI los botes y embarcaciones en la bahía y el VII contenía las disposiciones finales.

que sean irreconciliables o incompatibles con el posterior. Desde 1905 adoptamos la norma de hermenéutica de que

> ... una ley de la legislatura conteniendo una cláusula derogando [sic] todas las leyes [o] parte de leyes que sean incompatibles con sus disposiciones, pero que no derogue expresamente la ley anterior sobre la misma materia, deja en vigor todas las disposiciones de la ley anterior que no estén en contradicción con sus disposiciones. *Ex Parte Caraballo*, 9 D.P.R. 326, 332 (1905).

De todas maneras recordemos que en nuestro ordenamiento no se favorecen las derogaciones tácitas. R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, San Juan, Pubs. J.T.S., 1987, Vol. I, Cap. 66, pág. 421; *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989); *Aponte v. Srio. Hacienda, E.L.A.*, 125 D.P.R. 610 (1990); *Campis v. Pueblo*, 67 D.P.R. 393 (1947).

La próxima expresión del legislador aplicable a muelles y puertos es la Ley Núm. 59 de 30 de abril de 1928. 1928 Leyes de Puerto Rico 425.[8] A diferencia de la leyde 1906, esta ley incluyó referencias a las leyes anteriores en la Sec. 52: "Toda ley o parte de la ley que se oponga a la presente, queda por ésta derogada." 1928 Leyes de Puerto Rico 465. Sin embargo, como en la situación de la ley de 1906, no encontramos nada en esta ley que contravenga lo establecido por el legislador en el citado Art. 5 de la Ley de Puertos de 1886.

La conclusión obligada en esta etapa de análisis es que la vigencia, al menos del Art. 5 de la Ley de Puertos, no se vio afectada por la subsiguiente aprobación de la Ley de

---

[8] Por su parte, esta ley fue intitulada como "Ley de Muelles y Puertos de Puerto Rico". Mucho más detallada que la anterior, contaba con cincuenta y tres (53) secciones divididas también en VII capítulos. El capítulo I contenía las definiciones y disposiciones generales, el II atendía las inspecciones, reconocimientos y daños y perjuicios, el III las reglas para el servicio de prácticos, el IV los derechos de practicaje, el V los derechos por atracar o usar los muelles u otros sitios en los puertos de Puerto Rico, el VI los botes y embarcaciones en la bahía y el VII contenía también las disposiciones finales.

Muelles y Puertos de Puerto Rico de 1928. Nada de lo contenido en ésta parece indicativo de la intención de derogar las partes de la ley española que no fuesen irreconciliables.

En el 1968 se aprobó una cuarta Ley de Muelles y Puertos para Puerto Rico. Ésta es clara en cuanto a su efecto sobre la vigencia de la Ley de Puertos anterior: "La Ley Núm. 59 de 30 de abril de 1928 continuará en vigor tal cual se dispone en esta sección según dicha ley quedó modificada ...". Art. I, sec. 1.10 de la Ley Núm. 151 de 28 de junio de 1968 (23 L.P.R.A. sec. 2110). Este estatuto solo derogó artículos específicos de la legislación anterior y no afectó la vigencia del Art. 5 de la Ley de Puertos de 1886, *supra*,[9] ni las disposiciones en ella contenidas, que no sean incompatibles.

▇ Al evaluar integralmente las tres (3) leyes de puertos posteriores a la de 1886 se desprende que solamente reglamentan el servicio de muelles y puertos de la isla y que no contienen disposiciones que atiendan los problemas de titularidad de los bienes hallados en el mar. Es precisamente por esta razón que no podemos concluir que existen incompatibilidades entre ellas y, por ende, que hubo una derogación tácita del Art. 5 de la Ley de Puertos, *supra*. Por otro lado, el hecho de que un estatuto haya caído en desuso o que los usos y costumbres sean distintos a lo que en él está plasmado, no tiene el efecto o la consecuencia de que quede derogado. Art. 5 del Código Civil, 31 L.P.R.A. sec. 5.

Otro elemento que confirma nuestra conclusión de que la Ley de Puertos de 1886 está vigente es la jurisprudencia de este Tribunal. En *Rubert Armstrong v. E.L.A.*, 97 D.P.R. 588 (1969), resuelto después de aprobada la Ley de Muelles y Puertos de 1968, descansamos fundamentalmente en

---

[9] Los artículos de la Ley de 1928 que quedaron derogados fueron los siguientes: 1, 23, 26, 27, 28, 29, 32, 33, 34, 37(B), 38, 39, 40, 41, 42 y 44, 23 L.P.R.A. secs. 381, 403, 406, 407, 408, 409, 412, 413, 414, 418(b), 419, 420, 421, 422, 423 y 425.

la antigua ley para la resolución de la controversia allí implicada. Lo esencial del caso, para propósitos del problema que ahora ocupa nuestra atención, lo resolvimos descansando en la misma ley que hoy invocan las partes en este caso.

■ Por los fundamentos antes expuestos, resolvemos que el Art. 5 de la Ley de Muelles y Puertos de 1886, *supra*, para la Isla de Puerto Rico está vigente.

## V

■ Atendemos ahora el problema de interpretación que entraña el lenguaje del Art. 5 de la Ley de Muelles y Puertos de 1886, *supra*, al referirse a los objetos "que el mar arroje([10]) a la orilla y no tenga[n] dueño conocido".

■ Nos corresponde decidir si el silencio que guarda el Art. 5 de la Ley de Muelles y Puertos, *supra*, sobre los bienes u objetos hallados dentro del mar territorial permite o impide una interpretación para incluirlos en el ámbito de aplicación de la ley. En el ejercicio de nuestra función de intérpretes de las leyes, concluimos que están incluidos.

Acudimos en primer lugar a la legislación de la cual nació la Ley de Puertos española. Recordemos que ésta es prácticamente idéntica a la nuestra. Sólo con algunas modificaciones fue extendida a la isla.

■ Los antecedentes de este precepto se encuentran en el Título XII del Libro X de la Novísima Recopilación (ed. 1745) que se ocupaba de los bienes vacantes y

---

([10]) El diccionario de la Real Academia Española de la Lengua define la palabra *arrojar* de la forma siguiente: "arrojar - impeler con violencia una cosa, de modo que recorra una distancia, movida del impulso que ha recibido." *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 132.

mostrencos.([11]) Además, el decreto de 27 de noviembre de 1785 ordenó a los subdelegados de mostrencos a "conocer de todas las cosas que el mar arrojare [a] la orilla, y por consiguiente de toda embarcaci[ó]n náufraga que no tuviere dueño, con la prevenci[ó]n de que el casco de la embarcación con la artillería y demás pertrechos de guerrra pertenecen [a] S.M.". D.J. Escriche, *Diccionario razonado de legislación y jurisprudencia*, Madrid, 1874, T. II, pág. 92. De dicha orden se desprende que para el legislador español las "cosas que el mar arroje a la orilla" incluyen la embarcación náufraga y los artículos bélicos que estén sumergidos en el mar. La utilización de la expresión "y por consiguiente" así lo evidencia.

Una ley posterior "sobre adquisiciones del Estado; bienes abintestatos, etc.", aprobada el 16 de mayo de 1835, también deja claro que lo central para el legislador español no es si el objeto está dentro del mar o a sus orillas, sino que en efecto carezca de dueño o esté abandonado. Se manifiesta a través de la legislación española el interés por que este tipo de artefacto pase a manos del Estado.

Lo que mejor evidencia la política pública detrás del estatuto es la enmienda que ese mismo Art. 5 de la Ley de Muelles y Puertos, *supra*, sufrió en España el 17 de junio de 1929. A partir de esa fecha el estatuto establece:

> Pertenece al estado todo lo que, no teniendo dueño conocido, sea objeto de hallazgo en el mar, o en sus orillas, donde hubiera sido arrojado por las olas, siempre que no se trate de productos de la misma mar.

Sabemos, a la luz de las leyes anteriormente citadas, que la enmienda no respondió a cambio alguno en la intención del legislador español en cuanto al destino que debían sufrir estos bienes. Todo lo contrario, reafirma la

---

([11]) Un bien mostrenco es aquel que se encuentra perdido o abandonado sin saberse su dueño. D.J. Escriche, *Diccionario razonado de legislación y jurisprudencia*, Madrid, 1874, T. II, pág. 91.

política de que es el Estado el titular de los bienes hallados en el mar. Sin embargo, como la enmienda ocurrió treinta y un (31) años después del cambio de soberanía en Puerto Rico, la misma no afectó el Art. 5 de la Ley de Muelles y Puertos de 1886, *supra.* No obstante, razones de política pública favorecen que al interpretar el citado Art. 5 de esta ley le impartamos vitalidad tomando en consideración que tanto la ley española como la nuestra tienen los mismos orígenes y promueven intereses públicos análogos: el dominio eminente del Estado sobre esta clase de objetos.

El hecho de que en la época en que fue aprobada no existieran técnicas de buceo autónomo *que estuviesen generalizadas* explica también el silencio del legislador.[12] Desde entonces han ocurrido grandes desarrollos tecnológicos que han facilitado la proliferación de expediciones de salvamento para recuperar objetos de buques hundidos en las profundidades del mar.

Las circunstancias históricas que rodearon la elaboración de la norma eran totalmente diferentes a las presentes. Quizá fue por esta razón que no fue sino hasta 1962 que el legislador español aprobó una ley para reglamentar específicamente "los auxilios, salvamentos, remolques, hallazgos y extracciones marítimas". Al igual que en la situación de los estatutos anteriores, la legislación no confiere el dominio inmediato al que halle el objeto en el

---

[12] La práctica del buceo data de la época antigua. El primer aparato que permitía que el buzo pudiese respirar bajo el agua fue una especie de casco en forma de campana que se llenaba de aire y dentro del cual iba la persona. A la campana se le suministraba aire a través de una manga. En 1715 se desarrolló un traje de cuero que se usaba en expediciones de salvamento. Luego se comenzó a usar un traje con un casco de cobre que estaba conectado a un tubo que llegaba a la superficie. No fue sino hasta' temprano en el siglo XX que surgieron los aparatos de buceo independiente o autónomo (SARSA - sistema autónomo de respiración subacuática). Es decir, los mecanismos de respiración los llevaba consigo el buzo sin estar conectado a nada en la superficie. El *aqua-lung*, marca de primer aparato de respiración autónomo, se utilizó por primera vez en el año 1943. Fue desarrollado por Jacques-Yves Cousteau y Emile Gagnan. J. Dugan, *Word Book Enciclopedia*, Chicago, Field Enterprises Educational Corporation, 1968, Vol. 5, pág. 205. J.L.A. Passalacqua, *Delito cultural: el patrimonio cultural y la arqueología subacuática*, 60 (Núm. 4) Rev. Jur. U.P.R. 1231 (1991).

mar. *Legislación Civil Vigente,* Valladolid, Ed. Lex Nova, 1990, Vol. IX, pág. 1190.

 Como en la legislación española, el dinamismo y el cambio *no* fueron característica fundamental de la disposición puertorriqueña que regulaba los objetos hallados en el mar. No fue sino hasta el año 1987 que, mediante la Ley Núm. 10 de 7 de agosto de 1987 (18 L.P.R.A. sec. 1501 *et seq.*), la Asamblea Legislativa estableció una reglamentación específica dirigida a proteger los recursos arqueológicos subacuáticos. En la misma, se reafirma la titularidad del Estado sobre estos bienes y se declara como propósito la prevención de la destrucción del patrimonio cultural de Puerto Rico:([13])

> "La eficacia de la política pública de Puerto Rico declarada en esta ley descansa en dos pilares. Primero, se declara que todos los artefactos que puedan encontrarse sumergidos en las aguas

---

([13]) Cabe señalar que el Congreso de Estados Unidos también ha tomado la ruta protectora de recursos arqueológicos subacuáticos. El 28 de abril de 1988 el Congreso aprobó la *Abandoned Shipwreck Act of 1987* (43 U.S.C. sec. 2101 *et seq.*). Por medio de esta ley, el Gobierno de Estados Unidos reclamó título de propiedad sobre cualquier buque náufrago abandonado que se encontrase:

(1) incrustado (*embedded*) en los terrenos sumergidos de cualquier estado, el Distrito de Columbia, Puerto Rico, Guam, las Islas Vírgenes, Samoa y las Islas Marianas, 43 U.S.C. secs. 2101(a) y 2105(a)(1);

(2) incrustado en los arrecifes de corales protegidos por cualquier estado en los terrenos sumergidos del estado, 43 U.S.C. sec. 2105(a)(2), o

(3) en los terrenos sumergidos de cualquier estado y el buque náufrago se hubiese incluido, o se hubiese determinado que es elegible para incluirse, en el Registro Nacional de Sitios Históricos que mantiene el Secretario de lo Interior, 43 U.S.C. sec. 2105(a)(3).

Por medio de esta ley, el Gobierno de EE. UU. transfirió a los estados (y al Distrito de Columbia, a Puerto Rico, a las Islas Vírgenes, a Guam, a Samoa y a las Islas Marianas) los derechos de propiedad o la titularidad sobre los buques náufragos que se encontrasen en los lugares ya señalados. 43 U.S.C. sec. 2105. El propósito de esta legislación es proteger los intereses estatales en la administración y explotación de sus recursos acuáticos y subacuáticos, en particular los buques náufragos encontrados en los lugares ya señalados, en vista de que éstos son bienes que deben estar accesibles al público porque constituyen "recursos estatales irremplazables", de interés al turismo, a la investigación histórica, al recreo, etc. 43 U.S.C. sec. 2103(a)(1).

La sec. 2103(a)(2) de esta ley persigue el propósito de que los estados, propietarios de estos recursos (buques náufragos), garanticen al público el acceso razonable a los mismos.

68

de Puerto Rico pertenecen al dominio público. Como tal, no son susceptibles de ser apropiados para fines privados." J.L.A. Passalacqua, *Delito cultural: el patrimonio cultural y la arqueología subacuática*, 60 (Núm. 4) Rev. Jur. U.P.R. 1231, 1242 (1991).

Los hechos del presente caso, sin embargo, son anteriores a la aprobación de la Ley Núm. 7, *supra*, por lo que no puede ser aplicada a esta situación en particular. No obstante, para interpretar el alcance de la legislación anterior podemos acudir a la citada Ley Núm. 7. *Cía. Ferroviaria v. Srio. de Hacienda*, 80 D.P.R. 524 (1958). Bernier y Cuevas Segarra, *supra*, págs. 195, 372, 441 y 465. La interpretación que hoy hacemos del Art. 5 de la Ley de Muelles y Puertos, *supra*, confirma y fortalece los propósitos originales del estatuto de reservar para el Estado el dominio sobre los recursos arqueológicos subacuáticos. No olvidemos que para poder hacer efectivos los valores recogidos en la Ley de Muelles y Puertos de 1886, lejos de recurrir a definiciones estáticas de las palabras contenidas en determinado estatuto, se deben explorar los objetivos del legislador, las realidades sociales que motivaron el estatuto y el "modo en que, en una sociedad cambiante, pueden cumplirse mejor los valores que la ley entraña". *Badillo González v. F.S.E.*, 112 D.P.R. 665, 668 (1982). Véase, también, *Pueblo v. Morales Vázquez*, 129 D.P.R. 379 (1991).

Conforme a este principio y en vista de los desarrollos técnicos que han permitido la recuperación de artefactos abandonados en el océano por más de un siglo, nos corresponde la obligación de interpretar el Art. 5 de la Ley de Muelles y Puertos de 1886, *supra*, para incluir los objetos hallados en el fondo del mar. Somos conscientes de que para situaciones que hayan surgido con posteridad a agosto de 1987 no habrá que acudir a la ley de 1886, y se dilucidarán a la luz de la Ley Núm. 7, *supra*. Resuelto el problema de interpretación estatutaria procede que, según analizada, apliquemos el citado Art. 5 al caso de autos.

# VI

Aducen los recurrentes, Richard Fitzgerald y otros que este caso se debió haber resuelto bajo el palio de la Ley Federal de Almirantazgo, de acuerdo con lo que decidimos en *León v. Transconex, Inc.*, supra. Acto seguido, y paradójicamente, argumentan que son titulares de los bienes encontrados por haber ocurrido la ocupación como medio de adquisición de dominio.

La lectura que hacen los recurrentes de *León v. Transconex*, Inc., supra, es, a nuestro juicio, equivocada. El caso no impide la utilización de legislación puertorriqueña a casos de derecho marítimo. Todo lo contrario, además de reconocer la aplicabilidad de la legislación local a este tipo de litigio, el caso *permite* que se recurra a las leyes federales de almirantazgo. La impresión que recibimos de la interpretación que hacen los recurrentes es que estamos obligados por el derecho marítimo federal. Esta interpretación, a la luz del hecho de que contamos con legislación que específicamente atiende la situación, es incorrecta. No hay justificación para que, habiendo un estatuto local vigente, recurramos a la ley federal de almirantazgo. La solución que nos sugiere el señor Fitzgerald obvia el hecho de que de acuerdo con la Ley de Relaciones Federales, Puerto Rico goza del dominio sobre sus aguas territoriales y puede legislar sobre ellas, aun de manera inconsistente con el derecho federal.

La segunda parte del análisis del señor Fitzgerald plantea, de entrada, una contradicción adicional. Primero nos invita a que recurramos a la ley federal de almirantazgo para resolver el presente litigio. Sin embargo, toda su argumentación se fundamenta en la figura de la ocupación, que regula nuestro Código Civil y que parte de la tradición civilista.

Aun bajo el supuesto de que no se hubiese incu-

rrido en contradicción, la figura de la ocupación no opera en este caso en particular. El propio Código nos remite a las leyes especiales cuando de estos bienes se trata e impide que la ocupación se manifieste como una forma de adquirir el dominio. Al acudir a la ley especial, según la interpretación que su lenguaje permite, encontramos que la titularidad sobre estos bienes corresponde al E.L.A.

Por los fundamentos que anteceden, *se confirma el dictamen recurrido que declara titular del astrolabio y los demás artefactos encontrados al Estado Libre Asociado de Puerto Rico. Se devuelve el caso al Tribunal Superior para la determinación de la cuantía a ser concedida a los peticionarios a modo de compensación por los gastos incurridos en la búsqueda y recuperación de estos bienes. Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Rebollo López concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Negrón García se inhibió.